[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 786 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 787 
 On Application for Rehearing
This court's opinion released September 20, 2002, is withdrawn, and the following is substituted therefor. *Page 788 
In October 1997, Margie Adderhold filed a complaint for workers' compensation benefits based upon an injury that she suffered while working within the line and scope of her employment at Bostrom Seating, Inc. The Calhoun Circuit Court held an ore tenus hearing on August 29, 2000. On March 5, 2001, the trial court entered a judgment finding Adderhold to be permanently totally disabled. Bostrom filed a motion to alter, amend, or vacate the judgment or, in the alternative, for a new trial. The trial court denied Bostrom's postjudgment motion. Bostrom appeals.
The record reveals the following facts. Adderhold was 66 years old at the time of the trial; she had a high school education. Prior to the cessation of her employment with Bostrom following her injury, Adderhold had worked for Bostrom for 21 years; for the last 15 or 16 years of that employment she worked in the paint department as a painter. As a painter, her job tasks included, among other things, painting seats and parts attached to a conveyor chain; mixing paint, which involved lifting a 50-pound bag of dry paint mix[1] and pouring it into a hopper; and cleaning the paint guns. That work was semiskilled and light to medium in exertion.
Adderhold injured her back and neck in March 1996 when she picked up a 50-pound bag of dry paint mix. She immediately reported her injury to Bostrom. Adderhold was examined by Dr. Terry Taylor, Bostrom's company doctor. Dr. Taylor referred Adderhold to Dr. Thomas Francavilla who performed an MRI.
In May 1996, Dr. Faulkner, a board-certified orthopedic surgeon, diagnosed Adderhold with a possible disk herniation at L4-5 after examining Adderhold and reviewing the MRI. Among other things, Adderhold was complaining of back and leg pain. Dr. Faulkner's recommended treatment plan consisted of epidural blocks for pain relief, another MRI for diagnostic purposes, a cervical retraction, and physical therapy. Dr. Faulkner released Adderhold to return to work with the restriction that she lift no more than 10 pounds.
During May and June 1996 Adderhold received three epidural injections over a three-week period. The epidural injections caused Adderhold to develop heart palpitations (resulting in chronic heart arrhythmia) and high blood pressure. Adderhold's chronic heart arrhythmia has been stabilized with medication; she is required to take that medication for the remainder of her life. Because Adderhold's pain symptoms were not improving, Dr. Faulkner performed a lumbar diskogram in June 1996; that diskogram showed that Adderhold had degenerative disc disease at L4-5 and L5-S1. Dr. Faulkner did not release Adderhold to return work (although Adderhold worked "off and on" until December 3, 1996). In September 1996, Adderhold underwent a radiofrequency diskectomy; that procedure caused Adderhold to have heart palpitations, even though she was taking Lanoxin, and it caused her blood pressure to rise again. In November 1996, Adderhold received another epidural injection and experienced the same adverse reactions. No more epidural injections were administered to Adderhold.
In January 1997, Dr. Faulkner performed a lumbar fusion at L4-5 and L5-S1 on Adderhold. Although Adderhold initially experienced significant relief of her back and leg symptoms, the pain ultimately returned. Dr. Faulkner then *Page 789 
recommended that Adderhold obtain physical therapy and chiropractic therapy, and Adderhold followed that recommendation.
Bostrom's records reflect that Adderhold advised Bostrom that she was applying for Social Security benefits in March 1997. In July 1997, Adderhold was awarded Social Security disability benefits in the monthly amount of $874 (retroactive to December 3, 1996, the last day she worked at Bostrom). Adderhold began receiving those benefits in October 1997. Adderhold turned 65 years old on March 5, 1999, and the characterization of those Social Security benefits changed from disability benefits to retirement benefits.
On August 20, 1997, Dr. Faulkner determined that Adderhold had reached maximum medical improvement. Dr. Faulkner referred Adderhold to Dr. Roland Rivard, a board-certified orthopedic surgeon, for a functional capacities evaluation ("FCE") and a permanent partial impairment rating. In the FCE, Dr. Rivard assigned a 15% impairment rating to the body as a whole. Dr. Rivard identified the minimum "safe" restrictions for Adderhold[2]; those restrictions included standing for no more than 45 minutes (probably followed by a period of rest), walking for no more than 20-30 minutes (followed by a period of rest for 10-15 minutes), sitting for no more than one and a half to two hours, frequent lifting of no more than 16 pounds (noting that that limitation placed Adderhold in the DOT medium lifting category), no climbing ladders, no stooping, occasional crouching, and no restrictions on kneeling and manual and finger dexterity. Adderhold was authorized to return to work with the restrictions stated in the FCE; however, she chose not to return to work because she was experiencing pain in her back, hip, and legs, as well as numbness in her right leg.
Adderhold formally resigned from employment with Bostrom in October 1997. Tammy Porter, Bostrom's assistant resources director/benefits director, typed the resignation letter and Adderhold signed it. Adderhold's resignation letter stated, "Effective [October 16, 1997], I voluntarily resign my employment at Bostrom Seating, Inc.[,] because I am now receiving [S]ocial [S]ecurity disability."
Over the course of the following year, Adderhold continued to experience back pain, a burning sensation in her legs and feet at night, and pain in the right hip, buttock, and groin area, even though her X-rays showed that the fusion appeared to be "solid." Adderhold also continued to experience tenderness at the surgery site; because of that tenderness, a second spinal surgery was performed in November 1998 to remove hardware (rods and screws) that had been inserted during the first spinal surgery. During that surgery, Dr. Faulkner discovered that there had not been a solid fusion as expected and he performed a revised fusion. He also performed a foraminotomy at L4-5 and L5-S1 in an attempt to take pressure off the nerve to relieve Adderhold's right-leg pain.
Although Adderhold experienced some pain relief as a result of the second surgery, she continued to experience pain. In March 1999, Dr. Faulkner ordered an MRI which revealed some "scarring around the nerve"; Dr. Faulkner diagnosed that scarring as arachnoiditis, i.e., a chronic condition that can be caused by spinal back surgery. *Page 790 
Dr. Faulkner's deposition was taken one week before the trial and was admitted into evidence at the trial. Attached to the deposition were two articles on arachnoiditis that had appeared on the Internet; Dr. Faulkner referred to these articles throughout his testimony.[3] Agreeing with opinions expressed in the articles, Dr. Faulkner opined that arachnoiditis "can be disabling. It is not always disabling, and often we find . . . people who are asymptomatic. But it usually is something we attribute to severe, chronic, burning-type pain." Further agreeing with the articles, Dr. Faulkner opined that there is no cure for arachnoiditis, and it cannot be treated with surgery. Dr. Faulkner recommended pain management for Adderhold.
Upon reviewing the FCE conducted by Dr. Rivard in August 1997, Dr. Faulkner stated that he agreed with the FCE except that he would increase Adderhold's impairment rating to the body as a whole from 15% to 25% because of the second spinal surgery Adderhold underwent in November 1998 (over a year after the date of the FCE). Dr. Faulkner opined that the restrictions stated in the FCE were sufficient and applicable after the second surgery and the diagnosis of arachnoiditis. Dr. Faulkner opined that with pain management Adderhold should be able to perform "duties within [the restrictions stated] in the FCE."
Tammy Porter, Bostrom's assistant resources director/benefits director, also testified at trial. Porter testified that a nurse case manager is assigned to each workers' compensation case and prepares reports to keep Porter informed of that employee's situation. The reports regarding Adderhold were introduced into evidence at trial. The reports reflect that Adderhold intended to return to work following her first spinal surgery, but that she changed her mind in the spring of 1997 because she did not believe that she could perform the job based on her level of pain.[4] *Page 791 
Porter also testified that the job duties for a painter had changed gradually over the course of 1997 and that the method for loading the hoppers with dry paint mix had changed, eliminating the job requirement of lifting 50-pound boxes of dry paint. She testified that a painter was not required to lift over 16 pounds and that when she asked a painter currently performing the job if he could stand and sit at will, he responded affirmatively. Porter testified that a painter's job duties required no extended walking and no climbing except one step; she was unsure about the stooping requirements. Porter testified that she compared the restrictions in the FCE to the job duties and believed that Adderhold could perform the job. Although Porter and several other witnesses testified about the job duties, a job description was never introduced into evidence and the record does not reflect whether there existed a written job description of the job duties.
Both parties had vocational experts testify. David Head, who had a Ph.D. in rehabilitation counseling, testified on behalf of Adderhold. Dr. Head met with Adderhold in February 1998 and reviewed Adderhold's medical records through August 1997 (except the FCE) before preparing a vocational report in February 2000 that opined Adderhold was 100% vocationally disabled. Dr. Head admitted that his opinion was based primarily on Adderhold's opinion as to her perceived limitations because of her subjective level of pain. Dr. Head admitted that he had not reviewed a job description for a painter at Bostrom, the FCE, or up-to-date medical records at the time he formed his opinion. He believed that the vocational factors for determining disability under the Social Security law — age, education, work experience, exertional limitation, and lack of transferability of job skills — should be used for the Alabama workers' compensation law as well. Dr. Head admitted that the fact that Adderhold had received a 100% Social Security disability rating had influenced his opinion and that the receipt of Social Security benefits could cause a lack of motivation to return to work.
Within a week before the trial, Dr. Head had reviewed additional medical records, including the FCE and Dr. Faulkner's deposition. Although Dr. Head concluded that the restrictions Dr. Faulkner and Dr. Rivard had placed on Adderhold precluded her from returning to her job as a painter at Bostrom, he admitted that he still had not read a job description. Dr. Head opined that if Adderhold had to use her arms while standing she would need more frequent breaks than stated in the FCE. Dr. Head admitted that he did not know whether Adderhold was currently on pain medication.
Jo Spalding, Bostrom's vocational expert, met with Adderhold and reviewed all of Adderhold's medical records, physical therapy records, Dr. Head's vocational report, video surveillance tapes (discussedinfra), as well as the deposition testimony of Dr. Faulkner and Adderhold. Spalding interviewed Adderhold in October 1999. Spalding went to Bostrom and observed the painters performing their job duties in late 1999. Spalding testified that she observed workers lifting 50-pound boxes of dry paint mix; however, she quickly clarified that only a "lead" worker was required to lift the 50-pound boxes of dry paint mix — not all the painters.[5] Spalding prepared a vocational report in January 2000 and opined that Adderhold could have returned and performed her job as a painter at Bostrom with the restrictions stated *Page 792 
in the FCE. Spalding opined that that job was light work if the requirement of lifting the 50-pound box of dry paint mix was removed.
Spalding opined that, assuming Adderhold was unable to return to her job at Bostrom, Adderhold was 35% vocationally disabled. Spalding opined that Adderhold was capable of sedentary to light work. Although Spalding testified that Adderhold could perform the following jobs: tube inspector, winder machine operator, quality assurance inspector in a garment plant or in a tube factory, receptionist, appointment setter, department-store greeter, sandwich maker at a delicatessen-style restaurant, convenience store cashier as long a she did not have to lift more than 15 pounds, she did not know how many of those jobs were available in Adderhold's job market area. The trial judge was unpersuaded by Spalding's testimony, stating on the record that he "did [not] know of a tube plant anywhere in the country"; that it seemed unlikely that the other jobs could meet all the restrictions stated in the FCE; and that he was not going to give "a lot of weight to the testimony of [Bostrom's] vocational expert."
Adderhold testified at trial that she is in constant pain; however, she admitted that she does not take pain medication during the day because she does not need it. She testified that she has trouble sleeping at night because of her level of pain. She testified that she takes pain medication (i.e., 500 mg of hydrocodone) around supper time and another dose when the effects wear off during the night. She testified that she cannot sit still for long periods and has to wiggle and squirm to obtain relief.
Adderhold testified that she could drive and perform some housework and some yard work. She also testified that she and her husband took frequent trips in their recreational vehicle camper and that she participated in general camping activities, such as setting the table and squatting to retrieve food and beverage items from the camper.
Adderhold testified that she applied for Social Security benefits in the spring of 1997 while she was still recovering from the first surgery and was still undergoing physical therapy because she felt that she could not perform her job at Bostrom. In addition to the job duties previously mentioned in this opinion, Adderhold testified that she was often required to stand for one to two hours at a time without a break and that during 12-minute breaks (throughout the day) she was expected to crawl into a paint booth and sweep out the paint.
Cris Erickson, a private detective hired by Bostrom, testified at the trial. Erickson had observed Adderhold from June 6 through June 11, 2000, and on three other days. He documented his observations in two written surveillance reports and a video-surveillance tape. Erickson testified that he observed Adderhold "moving in a normal, fluid manner without apparent pain or discomfort." At her home, he observed her shaking out a rug and scratching her back. While Adderhold and her husband were camping, Erickson observed Adderhold doing such activities as stepping up and down the steps of the camper, setting up lightweight table and chairs, and stooping and squatting to retrieve food and beverages from the camper's food-storage compartment located on the lower side of the camper. In its final judgment, the trial court wrote that the surveillance tape "did not indicate that Plaintiff was doing anything outside the [prescribed] limitations of the Plaintiff" and that it was "lacking in its attempts to *Page 793 
prove that the Plaintiff could perform the job she had prior to the injury."[6]
The amount of Adderhold's average weekly wage was disputed at trial. At the time of her injury, Adderhold testified that she was earning $9.80 per hour. Bostrom had paid Adderhold temporary total benefits for 54 weeks and 3 days, through September 14, 1997, based on an average weekly wage of $392 (an amount consistent with Adderhold's testimony that she earned $9.80 per hour). Although Adderhold had not disputed before trial that $392 was the correct average weekly wage, she raised the issue at trial because her counsel realized for the first time during the trial that an average weekly wage of $392 did not include Adderhold's overtime pay. Adderhold introduced her 1993, 1994, and 1995 income tax returns showing that during those years she had earned $28,107.60, $30,131.08, and $25,903.14, respectively. Based on an average weekly wage of $392, Adderhold's annual earnings would total only $20,384. Because of the obvious discrepancy, the trial judge ordered Bostrom to provide, within 10 days after the trial, copies of Adderhold's payroll records for the 52-week period preceding her injury. Bostrom did not do so.
The standard of review in a workers' compensation case was stated by our Supreme Court in Ex parte Trinity Indus., Inc., 680 So.2d 262 (Ala. 1996):
 "[W]e will not reverse the trial court's finding of fact if that finding is supported by substantial evidence — if that finding is supported by `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'"
680 So.2d at 268-69 (quoting West v. Founders Life Assurance Co. ofFlorida, 547 So.2d 870, 871 (Ala. 1989)); § 25-5-81(e)(2), Ala. Code 1975 (providing that "[i]n reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence"). Our review of legal issues shall be without a presumption of correctness. § 25-5-81(e)(1) (providing that "[i]n reviewing the standard of proof set forth herein and other legal issues, review . . . shall be without a presumption of correctness").
Bostrom argues numerous issues on appeal. First, Bostrom contends that the trial court's finding that Adderhold was permanently and totally disabled was not supported by substantial evidence, referencing numerous specific findings of fact that it claims were not supported by the evidence or were supported only by inadmissible hearsay evidence. We have carefully and thoroughly reviewed the record and conclude that Bostrom's claims in this regard are without merit. Each of the specific findings with which Bostrom takes issue is, in fact, supported by substantial, competent testimony and/or other evidence.
Bostrom also contends that the trial court erred in not addressing what it characterizes as significant evidence (for example, Dr. Rivard's finding that Adderhold showed signs of symptom magnification when he conducted the FCE, see discussion, supra). Although § 25-5-88, Ala. Code 1975, requires a "statement of the law and facts and conclusions as determined by [the trial] judge," we are unpersuaded that Code section compels the *Page 794 
detailed findings Bostrom would have the trial court make. Cf. Lindseyv. Watson Van Lines, 722 So.2d 774, 776 (Ala.Civ.App. 1998) (substantial compliance with statutory requirement that workers' compensation judgment contain findings of fact and conclusions of law is sufficient). There is no requirement under § 25-5-88 that the trial court's order address every item of evidence and every aspect of a witness's testimony.
Bostrom also contends that the trial court erred in considering portions of Adderhold's testimony regarding her medical condition because, it says, that testimony was inadmissible hearsay evidence. However, Bostrom generally did not object at trial to Adderhold's testimony about her medical condition[7]; therefore, Bostrom did not preserve this issue for appeal. See Davis v. Southland Corp., 465 So.2d 397
(Ala. 1985) (a party seeking to prevent the admission of evidence must object to the offering of that evidence; failure to make an objection at trial waives that objection).
After a careful review of the record, we conclude that the record contains substantial admissible evidence to support the trial court's finding of permanent total disability. This court's role is not to reweigh the evidence, but to affirm the judgment of the trial court if its findings are supported by substantial evidence and, if so, if the correct legal conclusions are drawn therefrom. Ex parte Trinity Indus.,680 So.2d at 268-69; Fryfogle v. Springhill Mem'l Hosp., Inc.,742 So.2d 1255, 1258 (Ala.Civ.App. 1998), aff'd, 742 So.2d 1258 (Ala. 1999).
Next, Bostrom contends that the trial court erred in failing to specify in its judgment the date that Adderhold reached MMI. In order for an employee to recover permanent partial disability or permanent total disability benefits, the employee must have reached MMI. Hillery v.MacMillan Bloedel Inc., 717 So.2d 824 (Ala.Civ.App. 1998). "The date of MMI indicates the date on which the claimant has reached such a plateau that there is no further medical care or treatment that could be reasonably anticipated to lessen the claimant's disability." G.UB.MK.Constructors v. Traffanstedt, 726 So.2d 704, 709 (Ala.Civ.App. 1998). "`[T]he "time of temporary total disability" is the recovery period that lasts until maximum medical recovery is reached.' When [MMI] is reached depends on the circumstances of the particular case." Id. at 708 (citations omitted).
On appeal, Bostrom contends for the first time that the evidence suggests two possible MMI dates — August 1997 or February 1999. Before the trial court, however, it was undisputed that Adderhold reached MMI in August 1997. A trial court's failure to state the date a worker reached MMI is not error if it is undisputed that the worker reached MMI on a certain date. Brown v. Michelin North America, Inc., 785 So.2d 1136
(Ala.Civ.App. 2000). Moreover, because Bostrom did not raise the issue of two possible MMI dates at the trial court level, it cannot raise that issue for the first time on appeal. See, e.g., Andrews v. Merritt OilCo., 612 So.2d 409, 410 (Ala. 1992) (refusing to consider an issue raised by the appellant for the first time on appeal).
We note that in Adderhold's brief on appeal, she argues that the trial court *Page 795 
implicitly determined the date of MMI to be October 1, 2000, because she says, the court awarded temporary total benefits to that date. From our review of the record, it appears that Adderhold has confused this issue with the trial court's attempt to calculate the amount of permanent total disability benefits owed to the date of the judgment.
Next, Bostrom contends that the trial court erred as a matter of law by not considering what Bostrom claims was undisputed testimony and evidence regarding Bostrom's willingness to accommodate Adderhold and Adderhold's failure to attempt to return to work after accommodations had been made and after she had been released to return to work.
Section 25-5-57(a)(4)d., Ala. Code 1975, provides that any employee who refuses to accept a reasonable accommodation "shall not be deemed permanently and totally disabled." If a reasonable accommodation would enable an employee to perform the essential functions of the job, the trial court should take that fact into consideration when determining the ability of the worker to perform the employment. Cooper v. Seven Rivers,Inc., 688 So.2d 883 (Ala.Civ.App. 1997). With respect to accommodation, the trial court found:
 "Ms. Porter testified that Bostrom Seating had made accommodations for [Adderhold] so that she would not have to lift the fifty pound boxes of paint mix.
". . . .
 ". . . [Adderhold] was unable to return to work even with the accommodations [Bostrom] testified were made. As such, because [Bostrom] offered no accommodations that would have allowed [Adderhold] to return to her job and there were no other jobs offered to [Adderhold] at Bostrom Seating, she was unable to return to work."
We note that the trial court did not find, and the record does not contain any evidence indicating that an accommodation (eliminating the requirement that she lift 50-pound bags of dry paint mix) was ever communicated to Adderhold. Bostrom's records reflect that Adderhold met with her nurse case manager twice after Dr. Faulkner placed Adderhold at MMI in August 1997 — once in September 1997 and again in November 1997. Neither of the nurse case manager's reports reflect that the accommodation was ever discussed with Adderhold. Bostrom's argument on this point is inconsistent — at times Bostrom argues that Adderhold never tried to work after the accommodation was offered to her and at other times Bostrom argues that Bostrom never had the opportunity to offer Adderhold the accommodation because she did not attempt to return to work after she reached MMI.
Bostrom claims that Adderhold's own testimony establishes that she never intended to return to work when she applied for Social Security benefits in the spring of 1997. Although we agree that Adderhold's testimony appears to confirm Bostrom's claim, it does not appear that the trial court placed much weight on that aspect of Adderhold's testimony. It is the duty of the trial court, which had the opportunity to observe the witnesses and their demeanor, and not the appellate court, to weigh the evidence presented. Blackman v. Gray Rider Truck Lines, Inc.,716 So.2d 698, 700 (Ala.Civ.App. 1998). We conclude that the record contains substantial evidence indicating that Adderhold did not want to return to work because of her level of pain. While an employee's unwillingness to return to work might support a claim that an employee was exaggerating his or her pain symptoms, in this case Adderhold's subjective pain complaints proved to have a legitimate physical *Page 796 
basis when the second spinal surgery revealed that the fusion had not occurred and that there was pressure on the nerves.
Bostrom contends that the fact that Adderhold resigned from Bostrom in October 1997 precludes her from recovering workers' compensation benefits. The record is plain that Adderhold resigned after informing Bostrom that she did not intend to return to work because she did not believe that she could perform her job based on her level of pain. Bostrom cites no legal authority in support of this contention and we do not further address this issue. Thomason v. Redd, 565 So.2d at 260.
Next, Bostrom contends that the trial court erred by holding that Bostrom must pay Adderhold permanent total benefits "for the remainder of [her] life," arguing that the award of such benefits should have at least been limited to "the rest of Adderhold's life or until further order by the court." In Thompson Co. Contractors v. Cole, 391 So.2d 1042
(Ala.Civ.App. 1980), this court reversed the judgment of a trial court that contained similar language. In Thompson, the trial court awarded permanent total benefits "for the rest of `[the employee's] natural life.'" Id. at 1044. In Thompson, this court held:
 "Section 25-5-57(a)(4)a provides that compensation for a permanent and total disability is to be paid `during such permanent total disability.'
 "As clearly provided by the Code section, the period of compensation for permanent total disability lasts only so long as the disability continues. Should the disability cease to be other than total at some future time, the compensation for permanent total disability could be terminated. § 25-5-57(a)(4)b, Code of Alabama 1975. Thus, the trial court's award is an incorrect application of the statute."
391 So.2d at 1046. We conclude that the trial court's award is an incorrect application of the statute.
Next, Bostrom contends that the trial court erred in its computation of Adderhold's average weekly wage. Bostrom contends that the amount of the average weekly wage (i.e., $392) reflected in the "First Report of Injury" was the only competent admissible evidence available for the trial court to consider regarding the correct amount of Adderhold's average weekly wage. We do not agree.
In its judgment, the trial court found:
 "[Adderhold] submitted into evidence her W-2 forms for 1993, 1994, and 1995. [Adderhold's] gross wages for those three years are as follows:
"1993: $28,107.60
"1994: $30,131.08
"1995: $25,903.14
 "The total amount [Adderhold] received over three (3) years (or 156 weeks) is $84,141.82, which computes to an Average Weekly Wage of $539.37. While the Court did not have the advantage of seeing [Adderhold's] pay slips for the first three months of 1996 ([Adderhold's] injury was on March 27, 1996), this Court finds [Adderhold's] pay history over three years is a legitimate and fair method by which to determine [Adderhold's] Average Weekly Wage. Furthermore, [Bostrom] has presented no evidence to dispute these figures, even though the Court ordered [Bostrom] to do so."
Section 25-5-57(b) provides that "[a]verage weekly earnings shall be based on the wages, as defined in Section 25-5-1(6) of the injured employee in the employment in which he or she was working at the time of the injury during the period of 52 weeks immediately preceding the date of the injury divided by 52. . . ." Section 25-5-1(6) *Page 797 
provides that the term "average weekly earnings" is "based on those earnings subject to federal income taxation and reportable on the Federal W-2 tax form. . . ."
"It is mandatory that the trial court use [the above-quoted statutory] formula [under § 25-5-57(b)] when the claimant of workers' compensation benefits has worked for the same employer for 52 weeks preceding his or her injury." Seven Rivers, 688 So.2d at 886. "[T]he claimant bears the burden of proving what the average weekly earnings were." Id.
An employee's federal W-2 tax forms are admissible evidence that the trial court can consider where the amount of the employee's wages are disputed. See Wheeler v. Lake Forest Property Owners' Ass'n, Inc.,523 So.2d 1083 (Ala.Civ.App. 1988). Bostrom did not object to the introduction of the W-2 forms at trial, and we find no error in the trial court's method of calculating the average weekly wage under the particular facts of this case. The trial court ordered Bostrom to produce the payroll records for the 52 weeks preceding the injury; however, Bostrom did not do so. The record reveals that at the time of the injury, Adderhold was earning $9.80 per hour. Based on a 40-hour work week, $9.80 per hour totals $392 weekly and $20,384 annually. Although Bostrom had paid Adderhold temporary total benefits using an average weekly wage of $392 (as reflected in the "First Report of Injury") that amount clearly did not include the overtime pay included on Adderhold's W-2 forms. Although the actual payroll records for the 52 weeks preceding the injury may have been the best evidence from which to calculate precisely the average weekly wage, the reason the trial court did not have that information was Bostrom's own failure to comply with the court-ordered discovery request.[8] We conclude that the trial court used a fair and reasonable method to determine the average weekly wage.
Next, Bostrom contends that the trial court erred by allowing into evidence a "1988 Vital Statistics of the United States Mortality Table" provided by the United States Department of Health and Human Resources to calculate Adderhold's life expectancy and by using the wrong number of years to calculate Adderhold's life expectancy.
From our review of the record, we conclude that Bostrom's claim that it objected to the introduction of the mortality table at the trial court level is without merit. The record plainly shows that Bostrom did not
object to the introduction of the mortality table. Bostrom claims that its counsel's statement on the record that she "[had not] seen that particular table" constitutes an valid objection.[9] We do not agree. The failure of a party to make an objection *Page 798 
at trial waives that objection. See Southland Corp., 465 So.2d at 402.
In Fovil Manufacturing Co. v. Watts, 569 So.2d 406 (Ala.Civ.App. 1990), this court held that where "no other evidence was offered at trial regarding the employees's life expectancy, . . . it was error for the circuit court to take judicial notice of any mortality table other than that provided for in § 35-16-3[, Ala. Code 1975]."[10] However, the facts of this case are distinguishable from the facts of Fovil. In this case, we conclude that the trial court properly considered "other evidence" of life expectancy that was offered by Adderhold at trial and admitted into evidence without objection by Bostrom.
Adderhold concedes on appeal, however, that the trial court used the wrong number of years to calculate her life expectancy, thereby causing it to make incorrect calculations of the attorney fee (which includes 15 percent of the present value of compensation benefits to be paid in the future, see Ex parte St. Regis Corp., 535 So.2d 160 (Ala. 1988)) and future disability payments. As of the date of the trial court's judgment, Adderhold was 67 years old. Based on the mortality table that was admitted into evidence at trial, the trial court should have used a life expectancy of 17.2 years to calculate the present value of Adderhold's future workers' compensation benefits.[11] Instead, the trial court used a life expectancy of 22.5 years for this calculation. Accordingly, we conclude that the trial court in turn erred in calculating the attorney fee and future disability benefits.[12] *Page 799 
Next, Bostrom contends that the trial court erred in awarding Adderhold costs in the amount of $1,750.21 because, it claims, that award was based on inadmissible hearsay evidence offered after the trial. The record indicates that Adderhold submitted a list of expenses totaling $1,750.21 to the trial court after the trial, but she did not support these expenses with invoices or other evidence. The trial court awarded Adderhold the itemized expenses and attached the list of expenses to its judgment as an exhibit.
Section 25-5-89, Ala. Code 1975, provides that "costs may be awarded by [the trial] court in its discretion and, when so awarded, the same costs shall be allowed, taxed and collected as for like services and proceedings in civil cases." Under that Code section and § 12-21-144, Ala. Code 1975, the taxing of costs in a case is within the trial court's discretion, subject to the guidelines of Rule 54(d), Ala.R.Civ.P.Littleton v. Gold Kist, Inc., 480 So.2d 1236 (Ala.Civ.App. 1985). The assessment of costs is merely incidental to the judgment and may be done at any time prior to the issuance of the execution. Id. at 1238.
Where a cost is not substantiated by an "invoice or other evidence," this court has held that a trial court abused is discretion in awarding the prevailing employee payment of that cost. Hooker Constr., Inc. v.Walker, 825 So.2d 838, 845 (Ala.Civ.App. 2001). Based on Hooker, we conclude that the trial court's judgment is due to be reversed to the extent it awards Adderhold costs; however, we except from our conclusion in this regard the filing fee in the amount of $119 and subpoena fees in the amount of $48, because the trial court could have taken judicial notice of these costs. The trial court's judgment as it pertains to all other costs is due to be reversed and the cause remanded for the trial court to reconsider its cost award.[13]
Next, Bostrom contends that the trial court erred by not allowing Bostrom's vocational expert witness to remain in the courtroom during Adderhold's testimony. At the beginning of the trial before any testimony was offered, Adderhold's counsel *Page 800 
requested that "the rule" be invoked[14] and that the witnesses who were expected to testify remain outside the courtroom except when it was his or her turn to testify. Bostrom's counsel requested that Bostrom's vocational expert be allowed to remain in the courtroom and to listen to Adderhold's testimony because "they've just always stayed in to hear the plaintiff testify because they're testifying in part about their observations of her and her credibility." The trial court denied that request and stated on the record that it did not know of any exceptions to the rule.
On appeal, Bostrom argues for the first time that its vocational expert fell under one of the four classes of witnesses who are exempt from the rule — "a person whose presence is shown by a party to be essential to the presentation of the party's cause." Rule 615(3), Ala. R. Evid. Regardless of the merit of Bostrom's argument, Bostrom did not make that argument as such to the trial court. After counsel for Bostrom explained that he intended to question Adderhold regarding her activities since Bostrom's vocational expert had interviewed her, the following colloquy occurred:
 "THE COURT: Do you have any major objection to the expert sitting in here?
 "[COUNSEL FOR ADDERHOLD]: I would not like for her to do so, Your Honor.
"THE COURT: You what?
 "[COUNSEL FOR ADDERHOLD]: I would not like for [Bostrom's] expert to sit in. I would like to invoke the Rule, and I don't know of any exceptions to that.
 "THE COURT: I don't either. Witnesses expected to be called will wait outside."
There was no further discussion regarding the issue. This court "will not hold a trial court to be in error unless that court has been apprised of its alleged error and has been given the opportunity to act thereon." SeaCalm Shipping Co. v. Cooks, 565 So.2d 212, 216 (Ala. 1990); cf. Knightv. Alabama Power Co., 580 So.2d 576 (Ala. 1991) (issue not sufficiently argued either to the trial court or on appeal will not be considered).
Lastly, Bostrom contends that the trial court erred by granting Adderhold a continuance at the first trial date when the request for the continuance was made in response to an objection by Bostrom to the anticipated introduction by Adderhold of medical records as to which Adderhold allegedly had failed to comply with § 25-5-81(f)(4).[15]
Bostrom did not object to Adderhold's request for a continuance, however. The granting of a continuance is within the discretion of the trial court. See McClendon Trucking Co. v. Jones, 729 So.2d 349
(Ala.Civ.App. 1999). Based on our review of the record, we conclude that the trial court did not abuse its discretion in granting the continuance.
Based on the foregoing analysis and authorities, the judgment of the trial court is affirmed in part and reversed in part. The cause is remanded for the trial court *Page 801 
to correct that aspect of its judgment relating to the period during which benefits are to be paid for permanent total disability, to correct that aspect of its judgment relating to Adderhold's life expectancy, and to recalculate the award of attorney fees and future disability payments based thereon, and to reconsider its cost award.
OPINION OF SEPTEMBER 20, 2002, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
Yates, P.J., and Thompson and Pittman, JJ., concur.
[1] The record reveals that the dry paint mix was contained in a bag inside a box; the words "bag" and "box" are used interchangeably throughout this opinion to accurately reflect the references in a witness's testimony and the trial court's judgment.
[2] The FCE indicated that Adderhold showed signs of symptom magnification and that she tested positive on four of five "Waddell signs." However, as discussed in this opinion, infra, Adderhold later underwent a second spinal surgery that revealed a physical reason for Adderhold's subjective pain at the time the FCE had been conducted.
[3] Those articles are "Arachnoiditis, National Institute of Neurological Disorders and Stroke," National Institute of Health, Bethesda, Maryland (April 1996, reviewed and updated May 2000), athttp://www.ninds.nih.gov/patients/Disorder/ARACHNOI/arachnoiditis.HTM; and Kevin Rahn, M.D. and Richard T. Holt, M.D., "Arachnoiditis, Spinal Surgery," at http://www.spine-surgery.com/Articles/arachnoiditis.html.
The articles were also introduced as separate exhibits at trial. Bostrom objected to the introduction of the articles at trial, except to the extent that Dr. Faulkner relied on them during his deposition testimony. Bostrom did not object to the articles during the deposition, except to the form of some of the questions regarding the articles.
[4] The February 1997 report stated that "[Adderhold] has mentioned a desire to return to work if she continues to progress without problems."
The March 1997 report stated that Adderhold advised Bostrom that she was applying for Social Security disability benefits and that Adderhold "will opt for retirement, if denied benefits"; that report also noted that "Disability versus retirement will be addressed with Bostrom."
The June 1997 report stated that "Adderhold does not plan on returning to Bostrom."
The September 1997 report stated that "Adderhold when asked does not feel that she is capable of returning to work at Bostrom. . . . She stated that her right leg was numb and occasionally `gave way.' Her right hip is also painful." That report further stated that "Adderhold, age 62, does not feel that she is able to return to work and is planning on retiring since she is `so close to age 65.'"
The November 1997 report stated that "Adderhold did not return to work. She applied and was accepted for Social Security benefits. She resigned from Bostrom. Her restrictions were `per the FCE results' of light duty." That report further stated that "[a] release to return to work with restrictions was given, but Ms. Adderhold chose not to return to work."
[5] Elsewhere, Porter testified that, because of a change in the method of loading the hoppers, the requirement of lifting 50-pound boxes of dry paint had been eliminated in 1997.
[6] Quoting Yellow Freight Systems, Inc. v. Green, 612 So.2d 1209, 1210
(Ala.Civ.App. 1992), the trial court also noted in its judgment that "`permanent total disability does not mean absolute helplessness, but instead it is the inability to perform one's trade, or the inability to obtain reasonably gainful employment.'"
[7] Bostrom did raise, and the trial court did sustain, an objection to Adderhold's testimony that Dr. Faulkner advised her not to lift anything heavier than a gallon of milk. However, later during the trial, the trial judge considered a statement regarding that fact made in Dr. Head's vocational report that was admitted into evidence without objection by Bostrom. The trial judge stated on the record that he believed that a gallon of milk weighed about 16 pounds, which equals the lifting limitation stated in the FCE.
[8] After much discussion on the record regarding the average weekly wage issue, the following exchange took place between the trial judge and Bostrom:
 "THE COURT: I don't see why you couldn't[,] with the payroll records[,] with the 52 [weeks] preceding the injury including overtime[,] figure it out.
"MS. PORTER: I just don't have that in her work comp file.
 "THE COURT: I am going to give you ten days to get that done and submit that."
[9] Bostrom includes the following excerpt from the transcript in its brief on appeal:
 "MR. RILEY [counsel for Adderhold]: That's all right now, Your Honor, but we'd like to offer a mortality table if the Court doesn't have one and ask counsel —
"THE COURT: What?
 "MR. RILEY: An occupational mortality table at some point. We can do that now if that's okay with the Court.
"THE COURT: It's fine with me.
 "MS. COBIA [counsel for Bostrom]: I haven't seen that particular table —
"Mr. RILEY: That's fine. That's all.
"The COURT: Okay."
[10] Section 35-16-3 provides:
 "The superintendent of insurance shall, within 10 days after final adjournment of each regular session of the legislature, cause to be delivered to the secretary of state the then current American experience and commissioners standard ordinary mortality tables, which the secretary of state shall cause to be printed in the bound volume of the acts of the legislature."
Section 35-16-4, Ala. Code 1975, provides:
 "(a) Mortality tables as printed in the bound acts of the legislature pursuant to section 35-16-3 shall be received in all courts of this state as evidence of the facts therein stated.
 "(b) The provisions of section 35-16-3 and subsection (a) of this section are cumulative and shall not prevent any court from taking judicial knowledge of mortality tables, as provided by law, nor affect the admissibility of such tables in evidence when offered in any other lawful and proper manner."
[11] Both parties represent to this court that, under the mortality table referred to in §§ 35-16-3 and 35-16-4, the life expectancy for a 67-year-old female would be 15.83 years, 1.37 years less than under the mortality table introduced into evidence at trial.
[12] Relative to the conceded error as to Adderhold's life expectancy as measured from the date of the judgment and the need to correct this error on remand, we note that the trial court made another error in calculating the worker's compensation benefits owed to Adderhold. In attempting to calculate the correct amount of permanent total disability benefits owed to Adderhold up to the date of the judgment, the trial court calculated those benefits through October 1, 2000, instead of March 5, 2001, the date the trial court entered its judgment.
In its judgment, the trial court found:
 "The evidence also revealed that the last day [Adderhold] received benefits under temporary total disability was August 1997.³ As such, this Court orders [Bostrom] to pay from September 15, 1997 through October 1, 2000 (or 158 weeks) the amount of $359.58/week, or $56,813.64. [Adderhold's] counsel is entitled [to] a 15% attorney's fee of the $56,813.64, or $8,522.01.
 "This Court further finds that [Bostrom] has failed to pay [Adderhold] the appropriate amount for the fifty-four (54) weeks and three (3) days [ending September 14, 1997,] during which [Bostrom] used $392.00 as [Adderhold's] Average Weekly Wage [to calculate temporary total disability benefits]. Two-thirds of $392.00 is $261.35. As such, [Adderhold] was underpaid $98.23 for 54.6 weeks or $5,363.35. This Court orders [Bostrom] to pay [Adderhold] $5,363.35 which represents the amount [Bostrom] underpaid [Adderhold] for fifty-four (54) weeks and three (3) days. [Adderhold's] counsel is entitled to an attorney's fee of 15% of $5,363.35, or $804.50.
 "WHEREFORE, this Court directs [Bostrom] to immediately pay to [Adderhold] and her counsel $62,176.99 which represents the underpayment to Adderhold for fifty-four (54) weeks and three (3) days and the amount she should have received from September 15, 1997 through October 1, 2000.
 "FURTHERMORE, this Court orders [Bostrom] to pay [Adderhold's] counsel $34,687.78 . . . representing their fee on the present value of [Adderhold's] claim. . . . This Court further orders [Bostrom] to pay to [Adderhold] $328.57/week for the remainder of [Adderhold's] life, which represents the present value amount owed to [Adderhold] after discounting the attorney's fee and expenses incurred in prosecuting this case.
"________________
 "³ Although the evidence before this Court is that the last payment was made in August 1997, [Adderhold's] counsel has informed this Court by way of letter that the last payment was actually made on September 14, 1997. [Adderhold] further submitted after the trial a copy of Mrs. Adderhold's last statement which verified that [Adderhold's] last payment was received September 14, 1997 instead of August 31, 1997. The statement further verified [Adderhold] was being paid two-thirds of $392.00/week and not two-thirds of her true Average Weekly Wage."
[13] Bostrom also argues that some of the costs claimed by Adderhold, even if properly substantiated, are not reimbursable. In light of our reversal and remand as to the issue of costs, we do not reach this issue.
[14] Rule 615, Ala. R. Evid., provides, in pertinent part, that "[a]t the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses." This historic practice has been referred to both as "sequestration of witnesses" and as "putting witnesses under the rule." Rule 615, Ala. R. Evid., Advisory Committee's Notes.
[15] Section 25-5-81(f)(4) provides that "[c]opies of [medical] records obtained by one party shall be furnished by certified mail to the other party not less than 21 days prior to trial . . ."