MOORE, Judge.
ATI Alldyne (“ATI”) appeals from a judgment of the Madison Circuit Court (“the trial court”), in an action stemming from the death of its employee, Gary Wi-seheart, in which it awarded workers’ compensation death benefits and the cost of funeral expenses to Wiseheart’s wife, Jean Wiseheart (“the widow”). We affirm the trial court’s judgment.

Facts

Wiseheart, a maintenance mechanic, was working at ATI’s metal-extraction plant (“the plant”) in Huntsville on December 7, 2008. He was not ill the day before and showed no signs of illness that day. As part of his assigned duties that day, Wi-seheart was required to work in relatively close proximity to a chemical reactor, referred to as T-3 reactor, for an extended period. At approximately 2:00 p.m., Chris Mills and James Langford, chemical operators and co-employees of Wiseheart, began the mixing process in the T-3 reactor in which they added scheelite ore to hydrochloric acid. Within a half an hour, Mills noticed the smell of rotten eggs resulting from the presence of hydrogen sulfide in the atmosphere, signifying to him that something was wrong. After unsuccessful attempts by Mills to locate a leak in the T-3 reactor system, the odor of rotten eggs became strongest around 4:00 p.m. near the “P trap,” a device located at the bottom of the T-3 reactor. Around that time, *176 Langford discovered Wiseheart lying face-up on the floor 15 to 30 feet from the P trap; Wiseheart was unconscious and unresponsive, whereas approximately seven minutes earlier Wiseheart had been observed working on a platform without any problem.
After telephoning a supervisor to report the situation and receiving instructions from a supervisor to don respiratory masks, Mills and Langford attended to Wiseheart until paramedics arrived. Upon arrival of a hazardous-materials team, exhaust fans in the plant were activated and bay doors were opened in order to clear the air. Wiseheart was taken to the Huntsville Hospital emergency room where he was treated for chemical poisoning. Wiseheart died on December 8, 2008, without ever regaining consciousness. A later autopsy performed by Dr. Valerie Green, a medical examiner working for the Alabama Department of Forensic Sciences, attributed Wiseheart’s death to “complications of hydrogen sulfide toxicity.”
At trial in August 2010, the widow maintained that Wiseheart died of hydrogen-sulfide poisoning. In support of her case, the widow proved that the particular bag of scheelite ore used in the mixing process on December 7, 2008, contained 50 times as much sulfur as the scheelite ore ATI generally used, which, according to Michael Shinn, the operations manager at the plant, could have resulted in an increased emission of hydrogen sulfide. The widow also showed that the exhaust system of the T-3 reactor could become overwhelmed and emit hydrogen sulfide into the plant during the mixing process, especially if the P trap runs low or out of water, which Mills testified happened at least three times on December 7, 2008, before Wiseh-eart was found unconscious. The widow also introduced evidence indicating that, when they went to Huntsville Hospital, Mills complained to emergency-room personnel of a headache and Langford complained of a burning sensation in his throat as well as a headache, both of which could have been due to adverse reactions to exposure to hydrogen sulfide.
Over the objection of ATI, the trial court admitted thiosulfate test results from a Pennsylvania laboratory purporting to show that Wiseheart had a significantly elevated level of thiosulfate in his urine on December 7, 2008. The trial court overruled ATI’s objection that the test results should be excluded on the ground that the widow had not established a chain of custody between Huntsville Hospital, where the urine sample was collected, and the Pennsylvania laboratory, where the urine same was purportedly tested. See Swanstrom v. Teledyne Continental Motors, Inc., 43 So.3d 564 (Ala.2009) (requiring proof of chain of custody of human-sample testing in civil cases). The trial court also admitted the deposition of Dr. Green over ATI’s objection that Dr. Green had relied on the same thiosulfate test results for which no chain of custody had been established. In her deposition, Dr. Green testified that the thiosulfate test results constituted the only “medical proof’ she had that Wiseheart had been exposed to hydrogen sulfide and that without those results she “would reconsider a different way of assigning the cause of death.” However, she repeatedly clarified that she did not base her opinion as to the cause of Wiseheart’s death exclusively on the thios-ulfate test results and that those results were not even the most important factor she considered. In reaching her conclusion as to Wiseheart’s cause of death, Dr. Green noted the circumstances surrounding Wiseheart’s working environment and his collapse on December 7, 2008, as well as multiple physical findings in the Huntsville Hospital records and in the autopsy report consistent with death by chemical *177 poisoning. Dr. Green testified that the thiosulfate test results “basically supported everything else.”
In defense, ATI called Dr. David J. Hewitt, an occupational-medicine physician, as an expert witness. Dr. Hewitt stated that, in some cases, exposure to hydrogen sulfide can cause death and result in the physical findings that were exhibited by Wiseheart; however, he did not believe that Wiseheart had died from hydrogen-sulfide exposure. Dr. Hewitt explained that Wiseheart’s physical findings were consistent with any number of causes of death other than chemical exposure, which Dr. Green also acknowledged in her deposition. To conclude that those findings resulted from hydrogen-sulfide exposure, Dr. Hewitt explained, an expert would have to ascertain that Wiseheart had inhaled a lethal dose of hydrogen sulfide. Dr. Hewitt testified that a human can receive a fatal dose of hydrogen sulfide in basically two ways, either by an acute “knock-out” exposure of extremely high levels of hydrogen sulfide, which immediately incapacitates a human, or by prolonged exposure to elevated levels of hydrogen sulfide in the atmosphere, which results in a deteriorating physical condition before rendering a person unconscious. Dr. Hewitt testified that he had inspected the plant and had found no possible source near where Wiseheart’s body was found that could have emitted a sudden burst of a knock-out dose of hydrogen sulfide, so he had eliminated that possibility. Dr. Hewitt also ruled out prolonged exposure to high levels of hydrogen sulfide because humans cannot smell hydrogen sulfide at significantly elevated levels and both Mills and Langford, who had been working near where Wiseheart had been working, testified that they had consistently smelled the odor of rotten eggs throughout the day. Dr. Hewitt also stated that he did not believe that hydrogen sulfide could have accumulated in sufficient quantities at Wiseheart’s location to cause death because hydrogen sulfide quickly diffuses in the air and Wiseheart was not in a confined space. Dr. Hewitt also noted that Mills and Langford did not exhibit any physical symptoms of exposure to higher levels of hydrogen sulfide despite their proximity to Wiseheart and the T-3 reactor. Dr. Hewitt attributed Wiseh-eart’s death to sudden cardiac arrest, to which Wiseheart was susceptible due to multiple preexisting conditions. Upon questioning by the trial court, Dr. Hewitt conceded that it was possible that Wiseh-eart may have been exposed to a sufficient quantity of hydrogen sulfide to cause minor adverse health effects that increased his stress level and precipitated a cardiac arrest.
The trial court entered its judgment on November 8, 2010. Among its findings of fact, the trial court stated:
“The testimony of Dr. Green supports a finding by the court that substantial, competent evidence exists to find that Gary Wiseheart sustained an accidental exposure to [hydrogen-sulfide] gas which caused or contributed to his death. The defendant attacks Dr. Green’s findings specifically relating to her acceptance of the thiosulfate urine analysis from the hospital as an indicator of the toxic exposure. The defendant ] also objected to the admission of the report ... which the hospital received as an ‘outsourced’ analysis because the local hospital does not perform such tests. The exhibit was admitted with the court duly noting the limited weight of the exhibit because of the ‘weak’ chain-of-custody issues. However, both the ‘head’ of the lab at the local hospital and the defendant’s expert, Dr. Hewitt[,] acknowledged familiarity with the outsourced lab and its chain-of-custody procedures. Dr. Hewitt testified *178 he has relied on tests from this same lab “when (he) had to.’ Without considering the ... report, the court considers the findings of the autopsy are sufficiently and substantially supported from independent sources, microscopic analyses, physiological and medical indications, opinions and records other than the thiosulfate analysis. Based upon all of the foregoing and totality of the testimony, both lay and expert evidence, the court hereby FINDS that Gary Wiseh-eart suffered an accidental exposure to [hydrogen-sulfide] gas which CAUSED OR CONTRIBUTED TO HIS DEATH....”
(Capitalization in original; emphasis added.) ATI timely appealed from the judgment on December 20, 2010. This court heard oral argument on November 8, 2011.

Issues

On appeal, ATI raises three issues: (1) that the trial court erred in admitting into evidence the results of the thiosulfate test due to a lack of evidence as to the chain of custody of the urine sample taken from Wiseheart; (2) that the trial court erred in admitting into evidence the opinion testimony of Dr. Green, which was based, in part, on the results of the thiosulfate test; and (3) that the trial court erred in finding that Wiseheart’s death was caused or contributed to by a lethal exposure to hydrogen-sulfide gas.

Analysis

In workers’ compensation cases, if there is substantial legal evidence to support the trial court’s findings, this court will not consider arguments regarding the trial court’s rulings on objections to the admission of evidence unless the record suggests the probability that the trial court’s findings have been influenced by that evidence. See O’Dazier v. U.S. Steel, Fairfield Works, 644 So.2d 966, 968 (Ala. Civ.App.1994). In this case, the trial court expressly indicated in its judgment that it found sufficient evidence to conclude that Wiseheart died from hydrogen-sulfide toxicity without considering the thiosulfate test results. See King Power Equip., Inc. v. Robinson, 777 So.2d 723, 729 (Ala.Civ.App.2000) (declining to address questions on admissibility of evidence when trial court indicated in its judgment that it did not base its findings on that evidence). Therefore, this court reviews the record solely to determine if the evidence, other than the thiosulfate test results and any opinions based thereon, constitutes substantial evidence to support the findings of the trial court. See § 25-5-81(e)(2), Ala. Code 1975. Our supreme court has defined the term ‘“substantial evidence! ]’ ... to mean ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved,’ ” Ex parte Trinity Indus., Inc., 680 So.2d 262, 268 (Ala.1996) (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)).
In this case, it is undisputed that hydrogen sulfide leaked from the T-3 reactor and that Wiseheart was exposed to the chemical due to his proximity to that reactor throughout his workday. The amount of hydrogen sulfide to which Wiseheart was exposed cannot be specifically determined due to the absence of operating sensors that day. However, some circumstances — namely, the high sulfur content of the scheelite ore, the inability of the P trap to maintain consistent water levels, and the unusual and strong odor of rotten eggs — indicate that the amount of hydrogen sulfide was overwhelming the T-3 reactor system. Mills and Langford continued to smell hydrogen sulfide, suggesting the level of hydrogen sulfide was insufficient to cause death; however, they were not in the same precise location as Wiseh- *179 eart, and Dr. Hewitt conceded that, because hydrogen sulfide quickly diffuses in the atmosphere, they could have smelled the hydrogen sulfide while Wiseheart may not have detected its odor. Dr. Hewitt also testified that it was possible that Wi-seheart, due to his location, may not have received a knock-out dose of hydrogen sulfide but that he could have been exposed to levels sufficient to cause distressful physical symptoms that precipitated a cardiac arrest.
Dr. Green and Dr. Hewitt both testified that Wiseheart exhibited physical findings consistent with death due to exposure to hydrogen sulfide. The experts both testified that those same findings could also result from death by other, natural means; however, under the circumstances, the trial court reasonably could have determined that the physical findings resulted from chemical overexposure, especially in light of the evidence indicating that, from the time Wiseheart was discovered unconscious, the employer and the medical personnel at Huntsville Hospital all treated the case as involving an accidental chemical exposure.
The trial court also heard evidence indicating that Wiseheart was not ill or exhibiting any signs of discomfort in the day and hour leading up to his exposure to hydrogen sulfide and that he was fully functioning only minutes before he was found unconscious near the P trap. Wi-seheart had multiple health conditions that independently could have caused cardiac arrest, but, considering the totality of the circumstances, the trial court reasonably could have rejected the premise that Wi-seheart coincidentally died from natural causes at the same time the plant was experiencing an unanticipated leak of hydrogen sulfide from a batch of scheelite ore with an unusually high sulfur content. In similar circumstances, our supreme court has held that a trial court reasonably could infer that an injury resulted from chemical exposure. See New River Coal Co. v. Files, 215 Ala. 64, 109 So. 360 (1926) (a causal connection between the accident and the disability may be inferred when an employee, apparently in good health and able to work regularly, can no longer work due to heart weakness following exposure to carbon monoxide that rendered him unconscious).
Undoubtedly, the employer presented substantial evidence indicating that Wiseh-eart did not die from hydrogen-sulfide poisoning, and this court, if acting as a fact-finder, might have reached a different result than the trial court. However,
“ ‘[o]ur review is restricted to a determination of whether the trial court’s factual findings are supported by substantial evidence. Ala.Code 1975, § 25-5-81(e)(2). This statutorily mandated scope of review does not permit this court to reverse the trial court’s judgment based on a particular factual finding on the ground that substantial evidence supports a contrary factual finding; rather, it permits this court to reverse the trial court’s judgment only if its factual finding is not supported by substantial evidence. See Ex parte M & D Mech. Contractors, Inc., 725 So.2d 292 (Ala.1998). A trial court’s findings of fact on conflicting evidence are conclusive if they are supported by substantial evidence. Edwards v. Jesse Stutts, Inc., 655 So.2d 1012 (Ala.Civ.App.1995).’
“Landers v. Lowe’s Home Ctrs., Inc., [14] So.3d [144, 151] (Ala.Civ.App.2007). ‘This court’s role is not to reweigh the evidence, but to affirm the judgment of the trial court if its findings are supported by substantial evidence and, if so, if the correct legal conclusions are drawn therefrom.’ Bostrom Seating, *180 Inc. v. Adderhold, 852 So.2d 784, 794 (Ala.Civ.App.2002).”
MasterBrand Cabinets, Inc. v. Ruggs, 10 So.3d 13, 16-17 (Ala.Civ.App.2008). We cannot substitute our opinion of the facts for that of the trial court. See Boise Cascade Corp. v. Jackson, 997 So.2d 1042, 1047 (Ala.Civ.App.2008) (“We may not reverse a judgment simply because we would have decided the facts differently than the trial court.”).
Because there is substantial evidence to support the findings of the trial court, we decline to address the merits of ATI’s argument as to the inadmissibility of the thiosulfate test results and any opinion expressed by Dr. Green based on those test results. The trial court’s judgment is affirmed.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.