863 So.2d 105 (2003)
Darrell KIMBRELL d/b/a Kimbrell Builders
v.
Larry Lee WHITE.
Larry Lee White
v.
Darrell Kimbrell d/b/a Kimbrell Builders.
2010886.
Court of Civil Appeals of Alabama.
April 25, 2003.
*106 Micheal S. Jackson of Beers, Anderson, Jackson, Hughes & Patty, P.C., Montgomery, for appellant/cross-appellee Darrell Kimbrell d/b/a Kimbrell Builders.
Roger W. Pierce of Haygood, Cleveland & Pierce, L.L.P., Auburn, for appellee/cross-appellant Larry Lee White.
CRAWLEY, Judge.
Darrell Kimbrell d/b/a Kimbrell Builders (hereinafter sometimes referred to as "the company") appeals from the trial court's judgment ordering it to pay workers' compensation benefits to Larry Lee White (hereinafter referred to as "the worker") for a back injury. The worker cross-appeals from that part of the trial court's judgment ordering that the company was not obligated to pay workers' compensation benefits for his carpal-tunnel syndrome. We affirm as to the company's appeal and reverse and remand as to the worker's cross-appeal.
On October 18, 2000, the worker sued the company seeking workers' compensation benefits for carpal-tunnel syndrome he alleged arose out of and in the course of his employment with the company; the complaint also sought additional damages on counts alleging fraud and the tort of outrage. On November 22, 2000, the company filed an answer to the count of the worker's complaint seeking workers' compensation benefits, and filed a motion to sever that count from the other counts stated in the complaint. On December 12, 2000, the company filed an answer to the worker's counts alleging fraud and the tort of outrage. On January 29, 2001, the worker filed an amended complaint to include in his count for workers' compensation benefits an allegation that he had injured his back on or about the first week of October 2000, during the course of his employment with the company. On March 22, 2001, the company filed an answer to the worker's amended complaint. On April 24, 2001, the trial court granted the company's motion to sever the workers' compensation claims and set the case for trial.
On January 22, 2002, after lengthy discovery, the trial court conducted a bench trial on the workers' compensation claims. On February 7, 2002, the trial court entered an order; that order stated, in pertinent part:

"FINDINGS OF FACT
"....
"8. [The worker] has alleged multiple injuries arising out of and in the course of his employment. The parties have admitted into evidence the deposition *107 and medical records of Dr. Mitchell L. Galishoff, as well as the medical charts of Dr. Stephen M. Collins, George H. Lanier Memorial Hospital, Dr. Cecil C. Waddell, Valley Orthopedics/Dr. Patrick L. Martin, the Kirkland Clinic at UAB (Dr. Christopher Paramore and Dr. Charles S. Cobbs), the University of Alabama-Birmingham Hospital, The Medical Center, and Collins Clinic.
"9. The court finds that [the worker] has carpal tunnel syndrome in both his left and right arms. The court finds, however, that the carpal tunnel syndrome is a pre-existing condition and, therefore, does not find that the carpal tunnel syndrome arose out of and in the course of [the worker's] employment with [the company]. The court does find, however, that [the worker] suffered a lumbar herniated disc in approximately October, 2000, arising out of and in the course of [the worker's] employment when he was injured while carrying a large wooden beam.
"10. [The company] has paid none of [the worker's] medical expenses. [The worker's] back surgery was performed at the University of Alabama Hospital at Birmingham. It is [the worker's] understanding that the physicians performed the surgery without cost to [the worker] based upon his indigent financial circumstances. [The worker] has received charges from UAB Hospital related to his treatment and surgery. [The company] shall pay all unpaid, past reasonable medical expenses and all future medical expenses related to [the worker's] back injury and surgery. [The company] shall not be responsible for the payment of [the worker's] medical expenses related to [the worker's] treatment for carpal tunnel syndrome.
"11. [The worker] has reached maximum medical improvement.
"12. [The worker] completed the eighth grade at Troup County High School in LaGrange, Georgia. He has no GED [certificate] or further educational training.
"13. [The worker's] job history consists almost exclusively of construction work. [The worker] has no readily transferrable job skills to other occupations.
"14. Randall S. McDaniel, a licensed occupational therapist and certified rehabilitation counselor, testified as a vocational expert. Mr. McDaniel interviewed [the worker] and conducted several tests. Mr. McDaniel administered math and reading portions of the Woodcock Johnson Psycho-Educational Test Battery and the Slosson Intelligence Tests, Revised. On the reading portions of the tests administered, [the worker] demonstrated reading capacity at the fifth grade level. On the math portions of the tests, [the worker] demonstrated performance at the seventh grade reading level. On the Slosson Intelligence Test, [the worker] obtained a total standard score of 94, placing him in the low average range, which is consistent with his work background. Upon consideration of [the worker's] educational history and abilities, his work history and medical condition, Mr. McDaniel concluded that [the worker] has a 100% vocational disability at the present time.
"15. [The company] offered no vocational evidence.
"16. [The worker] testified that he is unable to return to carpentry work. He cannot bend, stoop, lift, carry or climb to the extent necessary to perform his job duties as a carpenter.
"17. [The worker] complains of constant low back pain from his buttocks down into his left leg. He can only sit *108 for short periods of time without pain and can walk and stand for only relatively short periods of time without pain. He cannot bend at the waist.
"18. Following his back injuries, [the worker] has done some very sporadic light work. However, he has been unable to engage in gainful employment since October, 2000.
"19. [The worker] continued to take strong medications prescribed and monitored by Dr. Galishoff. [The worker] takes Lortab for pain and Xanax to help him sleep and for his nerves.
"20. Based upon the testimony presented by the witnesses, the stipulations of the parties, the medical testimony of the treating physician, Dr. Galishoff, and the medical records and vocational report admitted into evidence, the court finds that [the worker] has suffered a permanent and total disability as defined by the Alabama Workers' Compensation Act.

"CONCLUSIONS OF LAW
"21. Based upon the court's findings of fact, the court concludes that [the worker] is entitled to recover from [the company] workers' compensation benefits under the laws of the State of Alabama.
"....
"23. [The worker] is entitled to be compensated for permanent total disability resulting from his back injury and subsequent surgery, which arose out of and in the course of his employment with [the company].
"...."
On March 8, 2002, the company filed a motion to alter, amend, or vacate the trial court's judgment, to which the worker filed a response. On April 23, 2002, the trial court denied the company's postjudgment motion. On June 4, 2002, the company filed a notice of appeal to this court. On June 12, 2002, the worker filed his cross-appeal.[1]
On appeal, the company argues that the trial court erred by awarding workers' compensation benefits to the worker for his back injury because, it says, the worker failed to present substantial evidence of medical causation or legal causation. In his cross-appeal, the worker argues that even if his carpal-tunnel syndrome was a preexisting condition, that fact does not bar his being entitled to workers' compensation benefits for that condition.
The standard of review this court uses when reviewing a trial court's judgment in a workers' compensation case is well settled. The Workers' Compensation Act provides that "[i]n reviewing the standard of proof set forth herein and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness." § 25-5-81(e)(1), Ala.Code 1975. Our supreme court has stated the standard of review to be applied to the trial court's findings of fact as follows:

*109 "[U]nder the applicable standard of review, we will not reverse the trial court's finding of fact if that finding is supported by substantial evidenceif that finding is supported by `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'"
Ex parte Trinity Indus., Inc., 680 So.2d 262, 268-69 (Ala.1996) (quoting West v. Founders Life Assurance Co., 547 So.2d 870, 871 (Ala.1989), and citing § 12-21-12(d), Ala.Code 1975)). See also § 25-5-81(e)(2), Ala.Code 1975. Further, "[t]he [1992 Workers' Compensation] Act did not alter the rule that this court does not weigh the evidence before the trial court." Edwards v. Jesse Stutts, Inc., 655 So.2d 1012, 1014 (Ala.Civ.App.1995).

I. The Company's Appeal

The company argues that the worker failed to prove either medical causation or legal causation so as to entitle him to workers' compensation benefits for his back injury. In support of its argument, the company focuses on inconsistencies between the worker's testimony, the worker's answers to interrogatories, and medical records offered and accepted into evidence. It further asserts that there was no medical evidence or testimony that documented an injury to the worker's back in October 2000. The thrust of the company's argument at trial was to question the worker's credibility; the worker contended that he had reported his back injury; the company denied that he did; and the chronology of events concerning the worker's alleged work-related back injury did not match his medical records. Therefore, the company asserted, the worker did not injure his back on the job.
In his amended complaint, the worker stated that "on or about the first week of October 2000 while in the employment of [the company], [he] injured his back when he slipped and fell while carrying a beam across [the company's] job site." In response to an interrogatory from the company asking the worker to "[d]escribe in detail the injuries sustained in the accident," the worker responded, in pertinent part:
"I hurt my back carrying [a weight-bearing beam] with Perry. I slipped on mud at [the] carport. I notified Darrell Kimbrell and worked the rest of the day, then went to Emergency Room and the doctor first told me I pulled a hamstring then several weeks later was told it was my back."
At trial, during direct examination by his own counsel, the worker testified concerning his back injury, in pertinent part, as follows:
"Q. Did you have an incident where you hurt your back working for [the company]?
"A. Yes, sir.
"Q. Did that happen after that letter from Dr. Galishoff or before? [Dr. Galishoff had sent a letter to the company in August 2000 concerning the worker's carpal-tunnel syndrome.]
"A. After.
"Q. Do you remember the date that you hurt your back?
"A. No, sir, I don't.
"Q. All right. Was it in the year 2000?
"A. Yeah, seemed like it was about halfway through the year 2000.
"Q. Tell me what happened that time when you hurt your back?
"A. Me and another boy that was working for him [were] toting [beams].
"....
*110 "Q. Well tell me what happened with that beam that caused you to get hurt?
"A. Me andit had been raining, I think it rained for like a day and a half, and we [came] in that morning and [Darrell Kimbrell] told us to go around back and bring them around, you know, to where we could get ready to set them. And I thought it was funny because he only put two people toting them, and you know, you should have three or four people toting them at least because they're extremely heavy. And we went around there and we [were], you know, trying to get them around there where he wanted them.... And the boy that was helping me, he was on the front of the beam and I was on the back of it. And we [were] toting it around the house and he stepped up in the garage and he was walking across the concrete and I went to step up in the garage and where they poured the garage, you've got to dig a foot to where concrete goes down in the ground to help support the house, and there was a hole there, all the way around the whole house was a, you know, a little ditch around it. And when I went to step from the ground up on the concrete it was pretty muddy and my foot shot off in that hole. Whenever it did it ..., I dropped down probably six, eight, ten inches, and it was just a sudden jar with that weight. And whenever it jarred I felt a pain go down the back of my leg and up my back. And I told [the coworker] then, I said you know, I told him to stop, because he was trying to keep walking. And he turned around and looked at me and I told him we needed to set it down. And he set his end down and I more or less dropped mine because I couldn't hardly bend over.
"Q. Okay. Now, was there anybody on the job that day besides you and [the coworker]?
"A. [Darrell Kimbrell] was there....
"Q. Okay. You say [Darrell Kimbrell] was there. Was he in the garage where this happened, or where was he?
"A. He was on top of the first floor starting for the second floor. He was up on top of the house.
"Q. All right. Did he, did you and [Darrell Kimbrell] talk any after this event happened when you hurt your back?
"A. Yes, sir, I told him I hurt my back.
"Q. Okay. And what did, what did you do then?
"A. Well, whenever it happened I sat down for a little bit and I figured out that, you know, something was wrong, real bad wrong. So I went and got in the truck and it took me awhile to get home but I finally got home. And I laid there all that day, or the rest of that day. And it wouldn't, you know, it just, it got, it kept getting [worse] and [worse]. And so finally I ended up going to the doctor about it and he told me that I probably tore some muscles in my back or something.
"Q. All right. Let me stop you. What doctor did you go see?
"A. [Dr.] Galishoff.
"Q. Okay. Did you tell [Darrell Kimbrell] you were leaving the job site that day?
"A. Yes, sir.
"....
*111 "Q. Have you ever had any type of injuries, on the job, off the job, that kept you from working before this carpal tunnel and this back injury?
"A. No, sir.
"Q. Did you have an event where you were dragging a deer stand out of the woods one time and you hurt your back, do you remember anything about that?
"A. I pulled a hamstring on the back of my leg.
"Q. Which leg was that?
"A. It was, I'm not really sure now. It's been a long time ago. And I know the people at the [emergency room] where I went to whenever it happened they said it was a pulled hamstring...."
On cross-examination by the company's counsel, the worker testified, in pertinent part, as follows:
"Q. [Your] amended complaint states in paragraph five that on or about the first week of October of 2000 that you injured your back. That's what this amended complaint says, that the first week of October you hurt your back. And this amended complaint [w]as filed January 29, 2001. So in your amended complaint, anyway, you allege that you hurt your back the first week of October 2000; correct?
"A. I'm not sure what the date was when I was hurt.
"Q. Yeah. Well, assuming that this amended complaint is accurate obviously you had already had this injury the first week of October when you filed your original complaint October 18th; correct? If this is true, if this is accurate that you hurt your back the first week of October you didn't file the complaint until October 18th which is after the middle of October and you didn't say anything in the original complaint about your back, did you?
"A. I'm not sure whenever thatI know when I went to the lawyer to start with it was about my [workers'] comp on my wrists. And after I had, after I had went to the lawyers it was probably three to four and a half weeks after that, or maybe five weeks after that whenever my back got hurt. I'm not sure of the dates....
"....
"Q. Now isn't it true, Mr. White, that your allegation of a back injury is an afterthought, that you alleged in January of 2001, you alleged that you had hurt your back on the job in order to get this surgery done?
"A. No, sir.
"Q. All right. So the records of Dr. Galishoff have been admitted into evidence. And you've already testified to the Judge that after this back injury occurred you first went home but then it didn't get any better so you went to see Dr. Galishoff?
"A. Yes, sir.
"Q. All right. The only reference in Dr. Galishoff's records to anything about your back is on October 26th he's got, he is having a lot of leg pain. As a matter of fact, it doesn't even say anything about your back, it says, he also hurt his leg at work several weeks ago. That was on October 26, 2000. Are you sure you went to Dr. Galishoff and told him about pain in your back?
*112 "A. It was in the lower part of my back and my buttocks and in the back of my leg.
"Q. All right. Well on October 13 he says that you're having pain from your carpal-tunnel syndrome, there's nothing on there about your back or your leg. That's on October 13th. Then on October 26th he says, he's having a lot of leg pain. He also hurt his leg at work several weeks ago.
"A. I don't, I don't know what he writes on them things.
"Q. Okay. Well, that's what his records say. You've told [your counsel] that after this back injury occurred, you went home, you sat in bed, it didn't get any better, so then you went to see Dr. Galishoff.
"A. I had to make an appointment to see him.
"Q. Okay. Now the note attached to Dr. Galishoff's records dated October 26 says, pulled left hamstring at work two and a half to three months ago. Now ... hurting down to calf. That's what the note says. Did you tell the medical people there at Dr. Galishoff's office that you had pulled your left hamstring at work two and a half or three months ago?
"A. I told them that I had pulled my hamstring.
"Q. At work two and a half or three months ago?
"A. No, I didn't tell them it was at work.
"Q. Okay. Now according to these records you started seeing Dr. Galishoff June 29, 2000. That's his first entry of your first visit to him. Is that consistent with your memory?
"A. I don't even remember the date was when I seen him.
"Q. Okay. And I will represent to you and the medical records are in evidence that from ... June 29 up until that entry that I just talked to you about, October 26, there is no mention whatsoever about you having any back pain. Are you still saying that you told Dr. Galishoff that you had hurt your back toting a beam at work?
"....
"A. Yes, sir.
"....
"Q. All right. Now, [your counsel] asked you a question about a deer stand or something like that. I don't know, I don't think it was clear what happened. And I want to ask you some questions about that.
"This is ... the Lanier Hospital records and it's got October 21, October 21, 2000. It says this A.M. taking deer stand across, I can't read that word.
"A. Creek.
"Q. Across something. Boot got hung and he fell. Is that what happened on October 21, 2000?
"A. Actually what it was is I was taking a deer stand down in the woods to put it on a tree and I was crossing a creek and my boot got hung, I didn't fall, I slid down inside the creek. And they told me that it pulled a hamstring in the back of my leg.
"Q. Okay. And that is accurate as to the date, October 21, 2000?
"A. I'm not sure what the date was.
"Q. Well, do you have any reason to disagree with this record that says October 21?
*113 "A. No, I have no reason to disagree with it because I don't remember the date.
"Q. All right. Now, and that would be after you filed the verified complaint in this case alleging that you had carpal-tunnel syndrome; correct?
"A. I'm not sure whenever I filed that.
"Q. Okay. Well, we've established that that was October 18 that you signed that and filed it, October 18 and this is October 21, three days later you're doing this with this deer stand and according to this taking the deer stand across something and your boot got hung and you fell. You deny telling the doctor that you fell?
"A. I didn't tell him I [fell], I just told him that I slid down the side of a creek.
"Q. Okay. And that is what Dr. Galishoff's records talk about in October 26, [2000], it talks about you having leg pain doesn't it?
"A. No, I am not sure what they say. I haven't looked at them.
"Q. Okay. Well, now you have looked at them, we went over them and I'm not going to repeat that but October 26, [2000,] is when Dr. Galishoff for the first time says that you come to him and you've got [a] complaint of leg pain. So that would be in between, this accident here would be in between when you filed the complaint and when you saw Dr. Galishoff on October 26, wouldn't it?
"A. I guess.
"....
"Q. Okay. Well, we've already looked at this. October 13 you saw Dr. Galishoff, he says nothing about any pain in your leg. October 18 you filed the complaint and it says nothing about any pain in your back or leg. October 21 you have this incident with this deer stand.
"A. Uh-huh. (Affirmative response.)
"Q. Which you deny falling, according to your testimony, but you have this incident on October 21. Then you see Dr. Galishoff on October 26 and for the first time he's talking about you having leg pain.
"A. Yeah, he told me I had a pulled hamstring too.
"....
"Q. Okay. And in fact, [in your deposition testimony] you make a reference there that it was two days before you filed the lawsuit when you were toting the beam; right?
"A. I think it was a couple of days before I signed theI went down there, I told them what happened, then I had to go back to sign papers for them and medical releases and all this other stuff.
"Q. All right. Now you also told me, in your deposition you told me and you've told [your counsel] and the Judge here in court today that after this incident that you went to Dr. Galishoff after you first went home ...; correct?
"A. Yeah, it wasI don'tlet's see, if I remember correctly I don't think it was the same day.
"Q. In your answers to interrogatories, in response to number 12 you say, I notified [the company] and worked the rest of the day. It doesn't say anything about going home and resting, it says you worked the rest of the day ...; is that correct?
*114 "A. I don't think that is correct, because
"Q. Okay. Then you say, then went to the emergency room....
"A. I went to the emergency room but I didn't work the rest of that day.
"Q. Well, now, which way was it? I mean now you say you went to the emergency room. You told [your counsel] and the Judge that you went home first, tried to put ice on it or something, tried to see if it was going to get any better and it didn't, then you went to Dr. Galishoff.
"A. Yeah.
"Q. Well, Dr. Galishoff is not in the emergency room.
"A. No, I went to the [emergency room] to start with and they told me it was probably a pulled hamstring and then whenever I went back for my two week visit I told Dr. Galishoff that I had hurt myself and he explained to me that it was probably a pulled hamstring, and they didn't know what it was until they did the MRI to where they could see in my spinal track."
On redirect-examination by his own counsel, the worker testified that it was approximately one month after he had complained of back and leg pain to Dr. Galishoff that he was diagnosed with a herniated disc. Darrell Kimbrell testified that the worker had not notified him that he had injured his back or leg while carrying a beam; he further testified that the worker had previously injured himself when a beam fell on him on an occasion and under circumstances separate from those the worker had described, but that on that occasion the worker had refused his offer to be taken to the emergency room. Another employee of the company's also testified that he did not recall any incident in which the worker injured his back and that the worker had never told him that he had injured his back.
The deposition testimony and medical records of Dr. Galishoff were also offered and admitted into evidence. During his deposition, Dr. Galishoff testified in response to questions by the worker's counsel, in pertinent part, as follows:
"Q. It appears in July [2000] ... he had suffered some other type of injury, he discussed with you, on the job?
"A. Let meokay. Yes. On the 27th I say hurt himself at work. Got some wood jammed in his face and a beam fell on him. He was having pain in his upper back, having muscle spasm[s] and pain behind his left leg. So he was having pain in the upper back; basically lower back also going into the left leg.... So now we had a new problem. And I went ahead and added Soma, which is [a] muscle relaxant.... But I was hoping that the back pain and the leg pain would just resolve on its own.
"Q. I notice your notes indicate that a beam fell on him at work. Do you remember any more detail about what he said happened on that occasion?
"A. No, I don't remember any more detail.
"....
"Q. You're talkingexcuse me. September now, September 29?
"A. September 29 he came in and was having more leg pain. He attributed it toinitially to a hamstring injury several months ago, and that he was having problems when he lifted....
"....

*115 "A. Now, on the 26th
"Q. And, again, that's October. Right?
"A. October 26, his leg pain was getting worse.
"Q. Okay.
"A. And he hurt his leg several weeks ago at work. And I think this was in part related to what I had mentioned with the beam is what he was referring to. At first we thought he may have a DVT, a deep venous thrombosis, because we felt the cord in the back of the leg.... So I focused on that first and refilled his pain medication, [and] made arrangements to get that excluded.... And when he came back on the 9th of November, his pain actually became better characterized and he was having a clear neuropathic pain. Before it was a little bit vague.... But we do see thatI have seen often times in my practice people come in with back and leg pain and then later, after several weeks, it becomes ... a full blown radiculopathy or where a nerve is being pinched by a herniated disk or some other type of problem. And on the 9th of November it became pretty clear what he had, and we felt that he had a herniated disk or a pinched nerve....
"Q. Okay.
"A. On the 22nd he still continued to have a L5-S1 radiculopathy. And that refers to the two levelsthe level of a nerve that is coming out that's affected.
"Q. So that's really low back pain that's radiating down into one
"A. That's what we would call sciatica.
"Q. Okay. All right.
"A. And we felt it was becomingherniated disk that became more evident....
"Q. I notice on the November 22 visit, Doctor, you indicate that ... perhaps he has a herniated disk at that time, and you note that probably explains his leg pain all along. Explain that statement to me, please, sir?
"A. As I previously stated, sometimes the entire pain syndrome takes awhile to, what we call, declare itself where in the beginning his pain pattern didn't fit that sort of injury....
"....
"Q. Okay. And Doctor, based on your examination and treatment of the worker, did you have an opinion on whether or not his back injury was relate[d] to his employment?
"....
"A. It was temporally related to the time he came to me when he said he had a beam fall on him and he had back pain. The pain progressed and in a way that I would expect somebody with a worsening herniated disk from an injury to progress. And I can date it to the time he came in and told me he had an on-the-job injury. So in my opinion, yes, it would be related to that."
On cross-examination, Dr. Galishoff testified that in forming his opinion that the worker's injuries were work related, he relied on the history provided to him by the worker, his examination of the worker, and his interpretation of lab tests performed on the worker. When asked whether his opinion might change if different or additional information was provided to him, he stated that it was impossible to *116 tell and that it would depend on the information he received.
We conclude that based upon this recitation of the evidence that was before the trial court relating to the back injury allegedly suffered by the worker while he was on the job that there was substantial evidence supporting the trial court's judgment. Ex parte Trinity Indus., supra. Furthermore, while the company correctly asserts that inconsistent and conflicting evidence was presented, which it claims lessened the worker's credibility, "[i]t is the duty of the trial court, which had the opportunity to observe the witnesses and their demeanor, and not the appellate court, to weigh the evidence presented." Bostrom Seating, Inc. v. Adderhold, 852 So.2d 784, 795 (Ala.Civ.App.2002) (citing Blackman v. Gray Rider Truck Lines, Inc., 716 So.2d 698, 700 (Ala.Civ.App. 1998)). See also Edwards v. Jesse Stutts, Inc., supra. Any inconsistencies between the testimony of the worker and the evidence presented would affect the weight accorded to that testimony or evidence; that function is within the province of the trial court, not this appellate court. Accordingly, we affirm the trial court's judgment insofar as it ordered the company to pay workers' compensation benefits for the worker's back injury.

II. The Worker's Cross-Appeal

The worker cross-appeals from the trial court's denial of his claim for workers' compensation benefits for his carpal-tunnel syndrome on the basis that it was a preexisting condition. Our supreme court has stated:
"It is well settled that workmen's compensation is not limited to those in perfect health. If the employment aggravated, accelerated, or combined with a latent disease or infirmity to produce disability, the preexisting disability does not disqualify the claim under the `arising out of employment' requirement of the statute."
Ex parte Lewis, 469 So.2d 599, 601 (Ala.1985)(citing Southern Cotton Oil Co. v. Wynn, 266 Ala. 327, 333, 96 So.2d 159, 164 (1957)(in turn citing 1 Arthur Larson, Workmen's Compensation Law, § 12.20)). Further, while substantial evidence does support the trial court's determination that the worker's carpal-tunnel syndrome was a preexisting condition, this court has stated:
"[I]f a previous injury or infirmity has not demonstrated itself as disabling and has not prevented the employee from performing his job in a normal manner, then the pre-existing condition or disability does not disqualify the claim under the `arising out of and in the course of his employment' requirement of the statute."
Holt v. Dunlop Tire Corp., 646 So.2d 74, 76 (Ala.Civ.App.1994)(citing Ex parte Lewis, 469 So.2d 599 (Ala.1985), and Blue Bell, Inc. v. Nichols, 479 So.2d 1264 (Ala.Civ. App.1985)).
At trial, during his direct testimony, Darrell Kimbrell testified that the worker was often late for work, that he was not dependable, and that he often complained of pain in his legs, shoulders, knees, and back, and occasionally complained of pain in his hands and wrists. On cross-examination, however, Darrell Kimbrell testified that the worker met the standards of performance set for his job, and that the worker's job performance was acceptable "to a certain degree." Accordingly, the trial court could not deny the worker's claim for workers' compensation benefits on the basis that his carpal-tunnel syndrome was a preexisting condition because it "ha[d] not demonstrated itself as disabling and ha[d] not prevented [the worker] from performing his job in a normal manner." Holt, 646 So.2d at 76. Thus, as to the worker's cross-appeal, the trial court's *117 judgment is reversed and the cause is remanded for it to enter an order that is consistent with this opinion.
APPEALAFFIRMED.
CROSS-APPEALREVERSED AND REMANDED.
YATES, P.J., concurs.
MURDOCK, J., concurs in part and concurs in the result in part.
PITTMAN, J., concurs in the result.
THOMPSON, J., dissents.
MURDOCK, Judge, concurring in part and concurring in the result in part.
I concur with respect to Part I of the main opinion; I concur in the result as to Part II of the main opinion.
THOMPSON, Judge, dissenting.
I would affirm the trial court's determination in its entirety. With regard to Part I, in workers' compensation cases an employee must present more than evidence of mere possibilities such as would simply serve to "guess" the employer into liability. Eddy v. Dunlop Tire & Rubber Corp., 516 So.2d 709, 710 (Ala.Civ.App.1987). In order to prove that an injury is compensable under the Workers' Compensation Act, a claimant must prove by substantial evidence that an on-the-job accident caused the injury. § 25-5-31, Ala.Code 1975; Ex parte Moncrief, 627 So.2d 385, 388 (Ala. 1993). The main opinion affirms the trial court's award of benefits to the worker for his alleged on-the-job back injury. I do not find substantial evidence in the record to indicate that the problems the worker experienced with his back were attributable to an accident arising out of and in the course of his employment.
NOTES
[1] Upon reviewing the record on appeal, we concluded that the trial court had in fact ordered separate trials pursuant to Rule 42(b), Ala. R. Civ. P., rather than a severance of claims pursuant to Rule 21, Ala. R. Civ. P.; this appeal was thus from a nonfinal judgment. See Key v. Robert M. Duke Ins. Agency, 340 So.2d 781 (Ala.1976); Walker County Petroleum Council, Inc. v. Walker County, 368 So.2d 862 (Ala.1979); Seybold v. Magnolia Land Co., 372 So.2d 865 (Ala.1979); and Interstate Truck Leasing, Inc. v. Bender, 608 So.2d 716 (Ala.1992)(overruled on other grounds, State Farm Fire and Cas. Co. v. Owen, 729 So.2d 834 (Ala.1998)). On March 10, 2003, this court remanded the cause to the trial court to allow it the opportunity to certify its judgment as final pursuant to Rule 54(b), Ala. R. Civ. P. On March 21, 2003, the trial court certified its judgment as final.