THOMPSON, Presiding Judge.
Wal-Mart Stores, Inc. (“Wal-Mart”), appeals from the judgment of the Marshall Circuit Court finding that Marilyn Orr, Wal-Mart’s former employee, was permanently and totally disabled as a result of a work-related accident and awarding her worker’s compensation benefits based on that finding. For the reasons stated herein, we reverse and remand.
At the time of the accident made the basis of her worker’s compensation claim, *211 On- worked part time for Wal-Mart as a sales associate and worked full time at a textile mill. On August 16, 2004, while she was working at Wal-Mart, Orr slipped from a ladder and suffered a displaced proximal tibia fracture of her left leg (“the knee injury”). The following day, she underwent surgery to repair the fracture. Dr. Joseph Kendra performed that surgery.
Following his examination of Orr on September 10, 2004, Dr. Kendra released Orr to return to work at Wal-Mart as of September 20, 2004. He indicated, however, that she was limited to performing only a sedentary desk job. Dr. Kendra did not release Orr to return to work at the textile mill at that time. Orr returned to work at Wal-Mart answering phones while in a wheelchair.
Dr. Kendra’s medical notes reflected that, at her October 5, 2004, appointment with him, Orr was doing well but was experiencing some pain in her left knee. Dr. Kendra’s medical notes from Orr’s October 26, 2004, appointment indicated that, at that point, Orr was “tip toeing as far as weight bearing” but was not having any pain. The notes reflected that Orr was to slowly increase her weight bearing on her left leg to half of her weight over the following two weeks. Dr. Kendra reduced Orr’s restrictions at her Wal-Mart job, indicating that she could perform a sedentary desk job with occasional standing and walking. Dr. Kendra’s medical notes from Orr’s December 14, 2004, appointment with him reflected that her tibial fracture was “essentially healed,” that she was having no pain other than “aehiness with weather changes,” and that she would “advance her weight bearing and gradually return to regular duty at work.”
Orr testified that, for the six months following surgery, she used a walker to ambulate. During that time, she testified, she did not put any weight on her left leg. After six months, she began using a “quad cane,” or a cane with four posts at the bottom, to ambulate, and she began bearing weight on her left leg.
In January or early February 2005, Orr attempted to return to her job at the textile mill without the use of an assistive device to ambulate. Orr testified that, while at that job, she would lean on a buggy to walk from one position within the mill to another. Dr. Kendra’s medical notes reflected that, at Orr’s February 8, 2005, appointment with him, Orr indicated that she was having difficulty returning to her job at the textile mill and that she planned to quit that job. The notes from that appointment also indicated that Orr believed she could perform her regular job at Wal-Mart, and Dr. Kendra returned her to regular duty at Wal-Mart. At that time, Dr. Kendra indicated that Orr had reached maximum medical improvement and had not sustained any permanent impairment.
As she had indicated to Dr. Kendra, Orr quit her job at the textile mill. Afterward, she began working full time at Wal-Mart. She returned to her position as a sales associate on the floor of the store. Orr stated that, as she had done at the textile mill when attempting to work there, she would lean against a shopping cart, for support and for help with ambulation.
Dr. Kendra’s medical notes from Orr’s March 15, 2005, appointment with him indicated that she was experiencing pain and swelling in her left leg at the end of the day. He noted that she walked with a “slight left antalgic gait.” Medical notes from Orr’s appointment with Dr. Kendra on April 22, 2005, indicated that her left leg continued to swell at the end of the day and to ache. Dr. Kendra explained to Orr that she might continue to experience episodic swelling in her left leg for at least a *212 year and that her soreness was not uncommon. He explained that an intra-artieular fracture of the knee, which she had suffered, can give patients persistent problems.
On June 16, 2005, Orr contacted Dr. Kendra and expressed concern that her left knee did not function the way it did before the surgery and that she limped when she walked and could not stoop. Dr. Kendra determined that it would be in Orr’s best interest to have a separate, independent evaluation of her knee for impairment-rating purposes. Thereafter, Orr began treatment with Dr. William Hartzog at Gadsden Orthopedic Associates.
Orr first saw Dr. Hartzog on July 18, 2005. His notes from that appointment reflected that Orr had begun to develop some post-traumatic arthritis in her left knee. He wrote that he did “not see any reason to restrict activity as far as work goes.” Orr returned to Dr. Hartzog on September 9, 2005, and, in addition to continuing to experience pain in her left knee, she indicated that she was experiencing a problem with her left foot. Dr. Hartzog found that she had a plantar fi-bromatosis (a firm nodular mass) on the bottom of her foot. He indicated that the plantar fibromatosis was not related to her knee injury. Dr. Hartzog prescribed a medial sole and heel for her left shoe at that visit.
In late 2005 or early 2006, Orr’s job responsibilities at Wal-Mart expanded to include using heavy carts to retrieve merchandise from the warehouse, which was apparently attached to the Wal-Mart store in which Orr worked, and putting the merchandise on the floor of the store. At that time, Orr could walk without an assistive device, but she would still use one because “as time went on [her] knee would try to buckle, and [she] was afraid [she] would fall again.” She testified that she could walk 20 or 30 yards without an assistive device but that she would use a cane if she walked outside of her house “because [she] was afraid [her] leg would go out.” Orr testified that the pain in her left leg worsened as she began pulling the large carts of merchandise into the store.
According to Orr, in the spring of 2006, she began to experience pain in her left hip for the first time. Although, as she would later testify, she has constantly experienced pain in her left knee and has walked with a limp since the time of her August 17, 2004, surgery, Orr stated that the pain that developed in her left hip increased the severity of her limp. On April 18, 2006, Orr returned to Dr. Hart-zog. His notes from that appointment indicated that Orr was experiencing pain in her left hip and buttock area.
On June 6, 2006, Orr filed an action against Wal-Mart in which she sought worker’s compensation benefits based on the August 16, 2004, injury to her left knee.
On August 10, 2006, Orr returned to Dr. Hartzog, still complaining of pain in her left hip. After taking X-rays of Orr’s left hip, Dr. Hartzog diagnosed her with avas-cular necrosis of the head of her left femur. Avascular necrosis is the death of a bone, or a portion thereof, as a result of reduced circulation to the bone. Dr. Hart-zog opined that Orr’s avascular necrosis was “associated with a degenerative origin and ... circulatory origin” and was not related to her knee injury.
Dr. Hartzog’s medical records from Orr’s September 12, 2006, appointment with him reflected that Orr was continuing to complain of pain in her left hip and left knee. Dr. Hartzog did not recommend surgical intervention, but he did restrict *213 her to sedentary work with use of a cane for ambulation at work.
In November 2006, Orr sought treatment for her left hip from Dr. Wayne Goodson, an orthopedic surgeon. At her November 9, 2006, appointment with him, Dr. Goodson determined that Orr was a good candidate for a total left-hip arthro-plasty (i.e., a left-hip replacement). Dr. Goodson performed this surgery on Orr on December 26, 2006.
On January 23, 2007, Orr amended her complaint to allege that she had undergone surgery on her left hip and that the surgery had been necessitated by the August 16, 2004, injury to her left knee. She alleged that Wal-Mart had “refused to accept responsibility” for the problems she was experiencing with her left hip.
In March 2007, Orr returned to work at Wal-Mart. She continued to experience pain in her left hip. At a May 29, 2007, appointment with Dr. Goodson, Dr. Good-son determined that the December 26, 2006, surgery had failed, and, on June 6, 2007, he performed a second surgery on her left hip, revising certain of the hardware that had been placed in her left hip as part of the December 26, 2006, surgery. Following that second surgery, Orr resigned from her position at Wal-Mart.
The trial court held a bench trial on July 7, 2008. At the trial, the parties stipulated, among other things, that the injury to Orr’s left knee arose out of, and in the course of, her employment with Wal-Mart. The parties stipulated that the issues for determination at the trial were (1) whether Orr sustained a successive injury to her left hip as a result of her left-knee injury, and (2) the percentage of disability Orr experienced as a result of her left-knee injury and, should the trial court answer the first issue in the affirmative, her left-hip injury. During the trial, the trial court received into evidence, among other things, the depositions of Dr. Hartzog and Dr. Goodson, and it received live testimony from Orr, Orr’s daughter, and David Bled-soe, an occupational therapist.[1]
On August 6, 2008, the tidal court entered a final judgment, which, in pertinent part, read:
“7. ... After a full and complete reading of Dr. Goodson’s testimony, as well as the testimony offered by Dr. William Hartzog, the Court is convinced by clear and convincing evidence that there is strong medical and other evidence to establish a causal relationship between [Orr’s] original work-related injury to her left knee and the altered gait and stress associated with attempting to accommodate the problems associated with the knee and the resulting development of symptoms arising from the avascular necrosis in [Orr’s] left hip that ultimately required surgery.
[[Image here]]
“12. Based on all of the evidence presented, including the testimony of [Orr] and her daughter, the deposition *214 of Dr. Wayne Goodson and Dr. William Hartzog and the testimony of David Bledsoe that the Court finds supports the testimony of [Orr], the Court finds [Orr] to be uniquely credible in that her history of work prior to this on-the-job injury was one of consistent effort at two jobs. She obviously has a very strong work ethic. [Orr’s] efforts at returning to work after her knee surgery and persisting in that regard until such time that the second hip surgery required her to abandon efforts at work and retire prematurely, all convince the Court that [Orr’s] testimony with respect to her current limitations regarding her activities of daily living, her level of pain, and the manner in which she began to develop symptoms in her hip following attempts at full weight bearing while at work at Wal-Mart support the conclusion that [Orr] is totally disabled from all work, is not a viable candidate for vocational retraining and is entitled to an award of permanent total disability benefits.
“13. During the approximately three and one-half hours [Orr] was in the Court’s presence for the trial of this case, it was obvious that she significantly favored her left leg; she had significant symptoms in her left hip and in her left knee that altered the way she walked, the way she stood, the way she ascended the stairs into the witness stand, and the difficulty she had sitting while testifying, all of which fully support [Orr’s] current subjective complaints of pain and discomfort.
“14. [Orr’s] subjective presentation is further supported by the opinion of Dr. Hartzog wherein he confirmed that there is a greater than 50 percent likelihood that [Orr] will require a knee replacement due to her injury ....
“15. Finally, the Court is convinced that [Orr’s] hip condition was a manifestation of the injury to the left leg and knee and the resulting altered or antalgic gait contributed to the development of the symptoms and condition in the left hip that necessitated the two surgeries to the left hip.”
Based on those findings, the trial court awarded Orr temporary-total-disability benefits, accrued permanent-total-disability benefits, future permanent-total-disability benefits, and accrued and future medical expenses. Wal-Mart appeals.
The legislature has prescribed the standard by which this court reviews appeals from judgments in workers’ compensation cases. Section 25-5-81(e), Ala.Code 1975, provides:
“From an order or judgment, any aggrieved party may, within 42 days thereafter, appeal to the Court of Civil Appeals and review shall be as in cases reviewed as follows:
“(1) In reviewing the standard of proof set forth herein and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness.
“(2) In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.”
“[Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).
On appeal, Wal-Mart contends that the trial court erred in determining that Orr’s left-knee injury was the medical cause of her avascular necrosis. Wal-Mart argues that the only evidence of medical causation came from the deposition testimony of Dr. Hartzog and Dr. Goodson, each of whom *215 had treated Orr, and that, taken as a whole, their testimony does not constitute sufficient evidence of medical causation to support the trial court’s award of benefits for anything more than the scheduled injury to Orr’s knee.
As previously noted, the trial court found that Orr’s hip injury was caused by the injury to her knee; it did not conclude that the injury to the hip was directly caused by the accident that gave rise to Orr’s knee injury. Thus, in effect, the trial court found Orr’s hip injury to be a “successive injury.” Our supreme court adopted the successive-compensable-injury rule in Ex parte Pike County Commission, 740 So.2d 1080 (Ala.1999). In Ex parte Pike County Commission, the supreme court UTote:
“When determining whether a successive injury is compensable, the general rule is that ‘[wjhen the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury likewise arises out of the employment, unless it is the result of an independent intervening cause attributable to [the] claimant’s own intentional conduct.’ 1 [Arthur Larson & Lex K. Larson, Larson’s Workers’ Compensation Law] § 13.00 [ (1998) ]. In applying this rule to a factually similar case, the Supreme Court of Appeals of West Virginia held:
“ ‘[I]f a worker’s compensation claimant shows that he received an initial injury which arose out of and in the course of his employment, then every normal consequence that flows from the injury likewise arises out of the employment. If, however, a subsequent aggravation of the initial injury arises from an independent intervening cause not attributable to the claimant’s customary activity in light of his condition, then such aggravation is not compensable.
“ ‘Thus, the fact that the claimant is injured and then returns to work does not mean that he is foreclosed from demonstrating that the original injury became aggravated by some routine event which triggered its recurrence. Such routine event is ordinarily one where the claimant is doing an activity that would be customary in light of his condition.’
“Wilson v. Workers’ Compensation Comm’r, 174 W.Va. 611, 616, 328 S.E.2d 485, 490 (1984); see also Lou Grubb Chevrolet, Inc. v. Industrial Comm’n, 174 Ariz. 23, 26, 846 P.2d 836, 839 (Ariz.App.1992) (‘[An] employee’s reasonable conduct in causing a later nonindustrial injury does not relieve the employer of liability if the later injury is the “direct and natural result” of the compensable work injury.’). Thus, ‘a subsequent injury, whether an aggravation of an original injury or a new and distinct injury, is compensable if it is the direct and natural result of a compensable primary injury.’ 1 Larson, supra, § 13.11.”
740 So.2d at 1084. Thus, based on Ex parte Pike County Commission, the question before this court is whether there was substantial evidence indicating that Orr’s hip injury was a “‘natural consequence that flow[ed] from’ ” the undisputedly com-pensable injury to her left knee.
As previously noted, the trial court received into evidence the deposition testimony of Dr. William Hartzog, the first doctor to whom Orr complained of pain in her left hip and who first diagnosed Orr with avascular necrosis. In his deposition, Dr. Hartzog opined that there was no connection between Orr’s left-knee injury and her left-hip injury. Although he did testify that an abnormal gait that places stress on a hip can aggravate an underlying con *216 dition in the hip, he testified specifically with regard to Orr that neither her altered gait nor the trauma from the accident causing her left-knee injury had caused, contributed to, aggravated, or hastened the avascular necrosis in her left hip. We conclude that Dr. Hartzog’s deposition testimony does not constitute substantial evidence indicating that Orr’s left-hip injury was the natural result of her left-knee injury.
The only other source of evidence bearing on the question of whether Orr’s hip injury was a natural consequence of her left-knee injury was the deposition testimony of Dr. Wayne Goodson.[2] To say the least, Dr. Goodson’s deposition testimony is difficult to parse. In Dr. Goodson’s deposition, the following exchange occurred during examination by Orr’s attorney:
“Q. ... I want you to assume for the sake of this question that she didn’t have significant left hip pain and she was mostly focused on her left knee, no significant left hip pain whatsoever following the fall.
“Of course, she had the surgery almost immediately within twenty-four hours of the fall. She went through a convalescence period, she was then on a walker, and then ultimately she was taken to a quad cane. And then when she started attempting to put weight on the left side, that is on the left leg, within a couple of days of giving up, I guess the word would be the cane, she started having significant, she started having the symptoms in her hip, the actual notice of the painful symptoms in her hip.
“And she was already back at work at Wal-Mart. So what she was trying to do is she would actually lean on a buggy to try to attempt to walk and it happened within a couple of days of having to try to, you know, return to put significant weight on the left side, into the hip. She was really asymptomatic into the left hip until the weight bearing started.
“Assuming that to be the case, could you offer us an opinion of a reasonable medical probability as to whether or not either the fall contributed to the ultimate necrosis that necessitated surgery or her attempts at overcoming of guarding for the left knee during the recovery period contributed to the development of the symptoms that necessitated surgery in the left hip?
[[Image here]]
“A. Yes, I think it’s reasonable to make that assumption.”
Although, on its face, this exchange appears to provide substantial evidence indicating that Orr’s left-knee injury resulted in her left-hip injury, the factual development of the hypothetical question posed to Dr. Goodson was a substantively inaccurate representation of the evidence before the trial court at trial, rendering Dr. Good-son’s response irrelevant to the issue. Cf Golden v. Stein, 670 So.2d 904, 907 (Ala.1995) (holding that facts on which hypothetical question to expert witness are *217 based must be in evidence). Specifically, Orr’s attorney asked Dr. Goodson to assume that Orr began experiencing pain in her left hip almost immediately upon bearing weight on her left leg. The evidence at trial, however, clearly demonstrated that Orr was bearing weight on her left leg for more than a year before she began experiencing pain in her left hip.
Dr. Goodson’s later deposition testimony during examination by Wal-Mart’s attorney demonstrates that the discrepancy between the above-quoted hypothetical question and the facts that developed at trial affected Dr. Goodson’s opinion about the cause of Orr’s hip injury:
“Q. ... And I’m just asking, maybe a better way to ask it is just ask you why you believe that it was related to the fall at Wal-Mart.
“A. Well, if she was asymptomatic before and after she started weight bearing she began to have trouble with the avascular necrosis, or the hip pain, which later we found out from the MRI that turned out to be avascular necrosis, I think it’s safe to say either caused or probably aggravated the, whether it’s underlying or preexistent, I think at least it probably aggravated again the underlying problem. You know, as far as the altered gait, usually that comes along with the pain and comes from avascular necrosis.
“Q. So it is your opinion really that the altered gait did not cause or contribute to the avascular necrosis, it is the fact that the symptomology appeared when it did, is that right?
“A. I think it is safe to say that.
“Q. You think the altered gait came from the pain that was present?
“A. Whether it is from a knee or hip, you know, it is hard to say.
[[Image here]]
“Q. ... Assume for me that Mrs. Orr did not complain of left hip pain in the emergency room, she sought several months of treatment with Dr. Kendra and she actually was weight bearing and she did not complain of left hip pain at all during that time.
“Then assume for me this accident occurred in August of ‘04. She began seeing Dr. Hartzog [on] ... July 18th, 2005. As of July 18th, 2005, she was not[3] weight bearing, she was back at work, she was not having any symptoms in her left hip. She saw Dr. Hartzog again on September 9th of 2005. Again, she did not complain of pain in her left hip at all.
“She first complained of pain in her left hip to Dr. Hartzog on April 18th of 2006, at which point she said she is having pain in the left knee, but also in the left hip and left buttock, a year and eight months after the original accident. Would that be significant to you?
“A. No, sir.
[[Image here]]
“Q. I believe based on the notes from Dr. Hartzog that that August 10th, 2006, visit was the first time that he had actually diagnosed avascular necrosis. And I will refer you to his impression portion of that note. He says her problems with her hip today at this point in time I think are both related to the [avascular necrosis] of the femoral head and of the lumbo sacral level. But as I advised her, I do not think these are directly related to her tibial plateau *218 fracture because of the duration since that. And I would say that these are both associated with a degenerative origin, an [avascular necrosis] circulatory origin, but not specifically related to the plateau fracture. Do you agree with that statement?
[[Image here]]
“A. It is hard to say. A lot of times when you have trauma to the hip, it does not, avascular necrosis does not occur the next day. It is something that sort of develops. And, you know, it develops, I have seen it develop actually several years after having trauma to the hip. So, you know, I am not sure if I can fully agree with that statement.
“Q. ... But assume for me that she did not complain of left hip pain at all in the emergency room and did not complain of left hip pain at all to her physician until April 18th of 2006, which was a year and eight months after the accident. With those circumstances and if that scenario is correct, would you agree with Dr. Hartzog’s statement in the impression section of the August 10th, 2006 note?
[[Image here]]
“A. Yes.
“Q. ... And that’s primarily because of the time gap there in between—
“A. Sure.
“Q. —the day of the accident—
“A. Correct.
“Q. —and the day the symptoms appear; is that correct?
“A. Yes.
“Q. So if the history that is contained in medical records from Dr. Hart-zog is correct and the history that I have related to you is correct, you would not be able to relate the avascular necrosis of the left hip to the initial knee injury at Wal-Mart, would you, to a reasonable degree of medical probability?
“A. That’s correct.” [4]
*219 After initially testifying that there was not a relationship between Orr’s left-knee injury and her left-hip injury, Dr. Goodson testified as to the possible effects of an altered gait on a hip in response to further examination by Orr’s attorney:
“Q. ... And, Doctor, I guess, when I was asking a little while ago, and, I mean, I did not make myself clear, about walking with a limp, altered gait and or otherwise attempting to accommodate the injured site with a limp, the site I am talking about is the knee, could an altered gait in an attempt to protect the knee alter or impact the motion of the hip area so as to give rise or give rise to a series of events that could contribute to the worsening or hastening of avascu-lar necrosis?
[[Image here]]
“A. Yes.
[[Image here]]
“Q. Can repetitive stress and or traumas associated with an attempt to alter a gait as described in circumduction contribute to the development of symptoms in the avascular necrotic area in your judgment?
[[Image here]]
“A. Yes.”
However, upon further examination by Wal-Mart’s attorney, Dr. Goodson provided testimony that seemingly indicated that Orr’s altered gait did not, in fact, contribute to her hip injury:
“Q. So as far as the — there are two different, obviously, you could tell the causation questions here. But as far as the trauma itself and the fall itself, if the history that she did not complain of left hip pain until her third visit with Dr. Hartzog, as she said in her deposition on page ninety-six on April 18th, 2006, assuming that that is correct, you cannot state to a reasonable degree of medical probability that the avascular necrosis was caused by the trauma, correct?
“A. That is correct.
“Q. Have you seen any research, can you cite any research for me or any medical articles, treatises, seminar materials that would show that a modified gait would cause or contribute to the formation of avascular necrosis?
[[Image here]]
“A. No.
“Q. ... If someone like Ms. Orr fractured their left knee and began limping as a result, wouldn’t you assume that the pressure on the left hip, if it was the left knee that was fractured, would actually decrease and the pressure on the right hip would be increased, because of your limping motion?
“A. That is correct.
“Q. So if this avascular necrosis was the result of an altered gait, wouldn’t you suspect or wouldn’t you expect it to have formed in the right hip rather than her left hip?
“A. If you are assuming it is from the altered gait, yes.
“Q. So assuming the fact scenarios that I have given you are correct, you cannot state to a reasonable degree of medical probability that either the trauma or the altered gait caused or contributed to the avascular necrosis or the worsening of her symptoms, correct?
[[Image here]]
“A. There is no absolute certainty, yes, I agree.
*220 “Q. ... And in fairness to you, the standard really is not absolute certainty[;] it is a reasonable degree of medical probability, that under the circumstances you cannot say that her altered gait or the trauma to a reasonable degree of a medical probability caused or contributed to avascular necrosis or the symptoms worsening, correct?
[[Image here]]
“A. Yes.”
Reviewing Dr. Goodson’s deposition testimony as a whole, see McGough v. G & A, Inc., 999 So.2d 898, 905-06 (Ala.Civ.App.2007), we cannot conclude that it amounts to substantial evidence indicating that Orr’s left-hip injury, which was based on avascular necrosis, was a natural consequence of her left-knee injury. In other words, Dr. Goodson’s deposition testimony, when considered as a whole, does not provide evidence “of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer” that Orr’s left-hip injury was the natural result of her left-knee injury. See West, 547 So. 2nd at 871.
This court’s decision in Wal-Mart Stores, Inc. v. Kennedy, 799 So.2d 188 (Ala.Civ.App.2001), which the trial court cited and upon which Orr relies on appeal, is distinguishable from the present case in a manner indicative of the lack of substantial evidence in the present case. In Kennedy, an employee was injured on the job when she slipped in a cleaning solution that had been spilled. When she was examined shortly after the accident, it was revealed that, before the accident, she had suffered from asymptomatic avascular necrosis in both of her hips. The accident, however, caused her to break her left hip, which, in turn, required her to have to undergo surgery. Ultimately, because of continued pain in her left hip, she underwent a second surgery, this time to replace her left hip. While suffering these problems with her left hip, she developed a limp and placed much of her weight on her right hip. While recovering from her second surgery, she began to experience increasing pain and dysfunction in her right hip, ultimately leading to surgery to replace her right hip.
The trial court held that the employee’s right-hip injury was compensable as a successive injury that was a natural consequence of her left-hip injury. On appeal, this court concluded that substantial evidence supported the trial court’s judgment. Key to this determination was the fact that the employee had asymptomatic avascular necrosis in her right hip before the accident but, after the accident, and after putting significant pressure on her right hip because of her left-hip surgeries, her right hip became symptomatic.
In the present case, there is no evidence indicating that Orr suffered from asymptomatic avascular necrosis that preexisted the injury to her left knee and became symptomatic because of her left-knee injury. In other words, there is simply no evidence, as there was in Kennedy, that Orr’s altered gait aggravated a preexisting condition, nor is there substantial evidence indicating that Orr’s altered gait caused or contributed in any material way to the symptoms or underlying condition Orr experienced in her left hip.
Our supreme court has stated that “ ‘[i]t is a well established principle that evidence presented by a [workers’] compensation claimant must be more than evidence of mere possibilities that would only serve to “guess” the employer into liability.’ ” Ex parte Southern Energy Homes, Inc., 873 So.2d 1116, 1122 (Ala.2003) (quoting Hammons v. Roses Stores, Inc., 547 So.2d 883, 885 (Ala.Civ.App.1989)). Our review of the evidence in the present case demonstrates, at best, a mere possibility *221 that Orr’s left-hip injury was the natural consequence of her left-knee injury. By holding that substantial evidence supported this mere possibility, the effect of the trial court’s judgment was to “guess” Wal-Mart into liability for Orr’s left-hip injury. In so doing, the trial court erred to reversal.
Based on the foregoing, we conclude that the trial court erred when it found that Orr’s left-hip injury was the natural consequence of the August 16, 2004, injury to Orr’s left knee. As a result, we reverse the trial court’s judgment and remand the cause for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
PITTMAN, BRYAN, and THOMAS, JJ., concur.
MOORE, J., concurs specially.

. Bledsoe offered testimony with regard to, among other things, the effect of an altered gait on hip function. We do not, however, elaborate on Bledsoe's testimony because, as noted below, the only issue raised on appeal relates to the cause of Orr’s left-hip injury. Orr's attorney clearly indicated, in response to an objection from Wal-Mart, that he was not offering Bledsoe's testimony on the question of the cause of Orr's hip injury, and he indicated his agreement with Wal-Mart's attorney that Bledsoe would not be competent to offer testimony on that issue. Moreover, the trial court stated, in response to Wal-Mart's objection, that it would not consider Bledsoe's testimony in determining the cause of Orr's hip injury. Likewise, the trial court wrote in its final judgment that, “[i]n rendering this Judgment, the Court has not and does not consider Mr. Bledsoe's observations or opinion about the source or cause of [Orr’s] complaints.”

. Of course, Orr and her daughter testified at trial. We conclude that their testimony, however, does not provide substantial evidence bearing on the question of the cause of Orr’s hip injury. Indeed, the cause of Orr's hip injury is the type of question that is peculiarly within the province of a medical expert, given that the mechanisms and symptomology of avascular necrosis, the undisputed basis of Orr's hip injury, as well as the manner in which its symptoms can be affected by pressure and movement, are beyond the knowledge of a layperson. See Hokes Bluff Welding & Fabrication v. Cox, [Ms. 2070253, Oct. 31, 2008] — So.3d -, - (Ala.Civ.App.2008) (holding that the finder of fact is not authorized to determine "matters lying exclusively 'within the peculiar knowledge of medical experts’ " (quoting Ex parte Price, 555 So.2d 1060, 1062 (Ala.1989)).

. Because counsel for Wal-Mart had just indicated that Dr. Goodson should assume, for purposes of the hypothetical question being posed, that Orr was bearing weight on her left leg, we assume that the first inclusion of the word "not” in this sentence was either a mistake in transcription of the deposition or a mistake by the attorney.

. The same discrepancy that renders Dr. Goodson’s response to Orr's attorney's hypothetical question irrelevant renders irrelevant his affirmative responses to the following two questions posed by Orr’s attorney:
"Q. ... Finally, assume for me that there is a complete absence of symptoms in this lady with respect to her knee for that matter, or her left hip, prior to the traumatic fall. And then I do want you to assume while the medical records may not be as clear a picture of clarity as everyone would like, that following her attempts at weight bearing in the left lower extremity she began to develop at that time symptoms in the hip that were ultimately diagnosed as avascular necrosis, in your reasonable medical judgment, would that weight bearing and or otherwise the attempt at accommodating the knee be a contributing factor to the symptoms that resulted in surgery in your judgment?”
"Q. ... In light of Dr. Hartzog's August 10, 2006 note, Doctor, you have got a lady that, from appearing on the MRI, has a healthy right hip, no evidence by radio-graphs of avascular necrosis in the right side. She obviously was developing and had developed avascular necrosis in the left side. She has a history, assume this, of absolutely no symptoms of problems with respect to either hip prior to the fall. And then she has a developing histoty, even if it is several months developing hisloiy following a return to attempts at weight bearing.
"In your reasonable medical judgment, could the series of events that I have described, either the fall, associated with the fall, but probably more particularly, at least for my question, an altered gait and an altered form of motion with respect to the left hip following the fall, in your reasonable medical judgment, would it be reasonable or more probable that that series of events contributed to the worsening of the avascular necrosis that ultimately required surgery?"
(Emphasis added.)
Both of those questions assume a close temporal proximity between when Orr began bearing weight on her left leg and when she began to feel pain in her left hip. This as *219 sumption is not borne out by the record evidence, and, as previously noted, when the actual length of time between those two events (as confirmed by Orr's testimony at trial) was put to Dr. Goodson, he testified that there was not a relationship between the left-knee injury and the left-hip injury.