DONALDSON, Judge.
Jeremy McRae appeals from a judgment of the Madison Circuit Court in favor of Second Mile Development, Inc. (“Second Mile”), barring McRae from receiving temporary and permanent disability compensation under the Alabama Workers’ Compensation Act, § 25-5-1 et seq., Ala.Code 1975 (“the Act”), for an April 2009 work-related injury and denying McRae any worker’s compensation for a subsequent intervening injury. We affirm the judgment in part, reverse it in part, and remand the cause with instructions.

Facts & Procedural History

The evidence presented below reveals the following facts. McRae began working for Second Mile in February 2009. Second Mile is a charitable organization operating in Madison County, Alabama that provides various services to the community. Jamie Bush, a division director with Second Mile, recommended McRae, her cousin, for a position with Second Mile. McRae primarily worked in Second Mile’s warehouse and performed tasks that included bailing donated clothing, operating a forklift, accepting donations, testing donated electronics, and occasionally assisting with offsite-do-nation pickups.
On April 28, 2009, McRae was assisting with a donation pickup. After picking up the donation, he was returning to the Second Mile warehouse on his personal motorcycle and following the Second Mile truck when he was struck by another vehicle at an intersection. As a result of the collision, McRae suffered significant injuries, including an open, compound fracture to the left leg above the ankle, a broken collarbone, cuts to his fingers, and a broken cheek bone. The most serious injury, the injury at issue in this case, was the compound fracture of the tibia and fibula of the left leg and the open wound created by the fracture. On the day of the accident, Dr. Michael Miller, McRae’s treating physician for the injury, performed surgery on McRae’s left leg. Surgery included irrigation and debridement of the wound and placement of an intramedullary nail (“IM nail”) to stabilize the broken bones. McRae continued postoperative treatment with Dr. Miller. Dr. Miller noted on May 13, 2009, that the leg was healing.
*173 McRae’s recovery suffered a set back in June 2009 when the open wound developed drainage and breakdown. A “wound vac” was inserted to clear the drainage, and an intravenous “Hickman” catheter was inserted into McRae’s chest to administer antibiotics to fight a staph infection that had developed. The Hickman catheter and the wound vac were removed in late July 2009.
McRae returned to work with Second Mile on July 27, 2009, performing light-duty work, such as stuffing donation envelopes, putting together school-supply kits for children for the upcoming school year, and testing donated electronic equipment. McRae testified that a month and a half after returning to work he began performing other duties such as bailing clothes and unloading trucks. Testimony indicates that Dr. Miller released McRae for regular duty beginning on August 6, 2009.
In the months following his return to work at Second Mile, McRae was embroiled in an incident with a female coworker involving the exchange of inappropriate text messages that were sexual in nature. He and the female coworker, as well as other employees involved in the incident, were admonished for violating Second Mile’s sexual-harassment policy.
Testimony indicates that in November 2009 McRae’s recovery from the injury was again hampered, this time due to indications of a suspected infection that had developed in McRae’s left leg. The record reveals that on November 5, 2009, Dr. Miller surgically removed the IM nail from the leg and implanted antibiotic beads to combat the suspected infection. In his deposition testimony, Dr. Miller indicated that he felt that the fracture had healed to the point where the IM nail could be removed and the antibiotic beads could be implanted. McRae testified that he believed he refractured his left leg when stepping out of a truck two wéeks after the November 5, 2009, surgery; however, there is no medical evidence in the record to support McRae’s contention that he re-fractured his leg.
The record shows that on February 8, 2010, Dr. Miller, upon noting that there was no evidence of an infection, removed the antibiotic beads and implanted another IM nail. Dr. Miller’s medical records indicate that McRae’s leg exhibited no sign of infection during this surgery. Dr. Miller’s notes relating to McRae’s postoperative evaluation occurring two weeks following the surgery indicate that the wound was healing and that the fracture had “bridged at least on three sides and well aligned.”
According to Dr. Miller’s records, McRae had an office visit with Dr. Miller on May 24, 2010. Dr. Miller noted that McRae “seem[ed] to be doing pretty well generally.” Dr. Miller’s records relating to that visit further state that McRae’s “wound itself ha[d] healed in nicely and the surrounding soft tissues [looked] good.” Dr. Miller indicated that McRae had complained about his left foot going numb and that he had referred McRae to Dr. Brian Carter, Dr. Miller’s partner, to investigate the source of a nerve problem that might be causing the numbness. In the May 24 report, Dr. Miller ultimately recommended that McRae begin a work-hardening program “to see if we can normalize his work function a little more.” Dr. Miller also stated in the report that McRae was ready for a functional-capacity evaluation (“FCE”) and an impairment rating. The record indicates that Dr. Miller released McRae to return to work at modified duty as of May 24, 2010. Dr. Miller did not make a specific determination that McRae had reached maximum medical improvement (“MMI”) at that time. At trial, McRae admitted that, despite the recommendations from Dr. Miller, he did not *174 attend a work-hardening program and that he did not obtain an FCE at that time. McRae did under go nerve testing for the foot numbness with Dr. Carter, and Dr. Carter’s medical records indicate that the testing showed normal results.
Upon receiving notification of Dr. Miller’s release of McRae for modified work duty, Bush undertook efforts to contact McRae regarding his return to work. Bush stated that she exchanged text messages with McRae on or around June 1, 2010, in which McRae indicated that he would be able to return to work only if he could have “a hundred percent” assurance that he would not be around the coworker with whom he had previously exchanged inappropriate text messages. Bush testified as follows regarding her response sent via text message:
“And I said, ‘I can make you guys as far apart as possible, but I just can’t guarantee that you will never cross paths.’ I said, ‘I do understand, but since the document released you, I will need a letter of resignation. I hate this.’ Jeremy says, ‘Oh, I truly understand. We’ll get [my wife] to write me one up since I don’t have a computer.’ ”
She further testified that she would have accommodated Dr. Miller’s restrictions if McRae had returned to work. Testimony indicates that McRae started a lawn-care business in June 2010 and that he promoted his business with yard signs. McRae, however, contended at trial that he cut only six yards, that he was physically unable to perform the work, and that he did not consider the lawn work to be employment. Medical records indicate that McRae was working as a landscaper as late as August 4, 2010. Additionally, Bush had e-mailed McRae’s wife in June 2010 to see when McRae could return to work. McRae’s wife’s e-mail replies indicated that McRae would not be able to return to work due to several reasons, including: (1) the concern regarding working in close proximity to the coworker with whom he had previously exchanged inappropriate text messages; (2) that McRae did not want to perform office work and that he was not able to perform warehouse work; and (3) that McRae had started a lawn-care business to which he wanted to devote his time. Bush testified that, because of the substance of the communications she received from McRae and his wife, because McRae had started a lawn-care business, and because McRae had not affirmatively responded to the offer to return, she had assumed McRae had abandoned his job; thus, she stated that she formally terminated McRae’s employment with Second Mile on August 9, 2010.
On August 28, 2010, McRae again injured his left leg. McRae initially sought treatment with his personal physician on September 1, 2010, whose records indicate that the scar on McRae’s left leg had “bust open” after McRae stepped into a hole and twisted his leg. An X-ray report for that visit notes that the IM nail was still intact. McRae saw Dr. Miller on September 13, 2010, but Dr. Miller testified in his deposition that McRae did not inform him of the August accident. Dr. Miller noted that the area surrounding the wound had suffered some skin breakdown but that X-rays of the bone “showe[ed] excellent healing of the fracture.” Following a subsequent visit on September 23, 2010, Dr. Miller recommended removal of the IM nail and the implantation of antibiotic beads to combat a suspected infection. The injury required two additional surgeries.
In reports documenting office visits during November and December 2010, Dr. Miller noted that McRae’s wound was closed and looked excellent. On January 3, 2011, however, McRae returned com *175 plaining of pain. Dr. Miller noted that the fracture had healed and that the bone was strong enough to support McRae’s full body weight, that the skin over the wound had healed, and that an MRI and nerve test indicated that everything was normal. Dr. Miller testified that McRae had reached MMI as of the January 3, 2011, evaluation, but he referred McRae to Dr. Norman McCoomer for further treatment and pain management relating to pain McRae was experiencing in his left leg and his back. Dr. McCoomer diagnosed McRae with chronic pain, complex regional pain syndrome, pain in the limb, and depression. In his deposition testimony, Dr. McCoomer testified that McRae’s back pain was caused by an biomechanical change in McRae’s gait, due to the pain he experienced in the left leg, that forced him to “change [his] body weight” and “resulted in more stress being placed in [McRae’s] opposite leg, as well as the lower back.” He also testified that McRae had not reached MMI. Dr. McCoomer testified that he referred McRae to Alabama Therapeutic Center for an FCE, which was conducted on July 29, 2011. McRae was also treated by Dr. Keith Anderson, who testified that it was his opinion that McRae suffered from chronic pain in the left lower extremity of his leg due to his injury and the multiple surgeries, “as well as weakness in the muscles of the left leg from his injury.” Dr. Anderson stated, however, that McRae did not exhibit signs of complex regional pain syndrome. Dr. Miller recommended a course of treatment for McRae’s leg pain that required using a spinal-cord stimulator, and Dr. Anderson recommended at least a trial run of that treatment.
McRae sued Second Mile in the Madison Circuit Court on April 30, 2010, seeking benefits under the Act. In December 2011, Second Mile filed a motion to bifurcate the trial to first resolve the dispute as to the compensability of McRae’s injuries, followed by a trial concerning McRae’s disability. The trial court granted the motion, and the issue of compensability was tried in an ore tenus proceeding on March 29 and March 30, 2012. The trial court entered a judgment on May 1, 2012. The trial court found that McRae had reached MMI on May 24, 2010. The trial court also determined that McRae had unreasonably refused Second Mile’s offer of suitable employment and, thus, was barred from receiving temporary or permanent disability compensation under § 25-5-57(a)(3)e, Ala.Code 1975. The trial court further determined that McRae’s August 28, 2010, injury was a subsequent intervening injury and, thus, precluded McRae from receiving any workers’ compensation benefits from August 28, 2010, forward. McRae filed a motion to alter, amend, or vacate or, in the alternative, for new trial, which the trial court denied on July 8, 2012. McRae filed a timely notice of appeal to this court.
On appeal, McRae contends that the trial court erred (1) by placing the burden of proof concerning Second Mile’s defenses on McRae; (2) by determining that McRae’s August 28, 2010, injury was a subsequent intervening injury unrelated to his April 2009 work-related injury and, thus, was not compensable; (3) by finding that substantial evidence supported the conclusion that McRae reached MMI on May 24, 2010; and (4) by denying McRae any compensation under the penalty provisions of § 25-5-57(a)(3)e, Ala.Code 1975, for unreasonably refusing a suitable offer of employment.

Standard of Review

“The standard of appellate review in workers’ compensation cases is governed by § 25-5-81(e), Ala.Code 1975, which provides:
*176 “ ‘(1) In reviewing the standard of proof set forth herein and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness.
“ ‘(2) In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.’
“Substantial evidence is ‘ “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” ’ Ex parte Trinity Indus., Inc., 680 So.2d 262, 268 (Ala.1996) (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)). Additionally, a trial court’s findings of fact on conflicting evidence are conclusive if they are supported by substantial evidence. Edwards v. Jesse Stutts, Inc., 655 So.2d 1012 (Ala.Civ.App.1995). ‘This court’s role is not to reweigh the evidence, but to affirm the judgment of the trial court if its findings are supported by substantial evidence and, if so, if the correct legal conclusions are drawn therefrom.’ Bostrom Seating, Inc. v. Adderhold, 852 So.2d 784, 794 (Ala.Civ.App.2002).”
Denmark v. Industrial Mfg. Specialists, Inc., 98 So.3d 541, 543-44 (Ala.Civ.App.2012).

Discussion

McRae first contends that the trial court erred in assigning the burden of proof to him instead of Second Mile with regard to Second Mile’s defenses. The employee generally has the burden of proof to establish a right to workers’ compensation benefits under the Act. See Safeco Ins. Cos. v. Blackmon, 851 So.2d 532 (Ala.Civ.App.2002). The employer has the burden of proving any affirmative defenses or any issue that may reduce a workers’ compensation award. See 2 Terry A. Moore, Alabama Workers’ Compensation § 25:4 at 615 (1998)(“[T]he employer bears the burden of proof on any issue that may reduce its compensation outlay such as: the unreasonable refusal of the employee to accept suitable employment or to submit to medical treatment or vocational rehabilitation -”).
McRae makes a general reference to the trial court’s judgment in support of this argument. Second Mile does not address this argument. Although the trial court’s judgment does not specifically state that Second Mile bore the burden of proof as to any affirmative defense, there is no indication before us that the trial court improperly applied the burdens of proof. Further, it does not appear that McRae raised this issue with the trial court in his post-judgment motion. “This court will not address arguments made for the first time on appeal.” Cascaden v. Winn-Dixie Montgomery, LLC, 81 So.3d 1273, 1278 (Ala.Civ.App.2011), cert. denied, 81 So.3d 1278 (Ala.2011) (citing Andrews v. Merritt Oil Co., 612 So.2d 409, 410. (Ala.1992)).
McRae next contends that the trial court erred in concluding that McRae’s August 28, 2010 injury was not compensa-ble under the Act. Additionally, McRae contends that the injury to his left leg caused an altered gait that consequently contributed to the onset of back pain. As both parties concede in their briefs, the successive-compensable-injury test outlined by our supreme court in Ex parte Pike County Commission, 740 So.2d 1080, 1084 (Ala.1999), is applicable to this case:
“When determining whether a successive injury is compensable, the general rule is that ‘[wjhen the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury *177 likewise arises out of the employment, unless it is the result of an independent intervening cause attributable to [the] claimant’s own intentional conduct.’ 1 [Arthur Larson & Lex K.] Larson, [Larson’s Workers’ Compensation Law, ] § 13.00 [ (1998) ]. In applying this rule to a factually similar case, the Supreme Court of Appeals of West Virginia held:
“ ‘[I]f a worker’s compensation claimant shows that he received an initial injury which arose out of and in the course of his employment, then every normal consequence that flows from the injury likewise arises out of the employment. If, however, a subsequent aggravation of the initial injury arises from an independent intervening cause not attributable to the claimant’s customary activity in light of his condition, then such aggravation is not compensable.
“ ‘Thus, the fact that the claimant is injured and then returns to work does not mean that he is foreclosed from demonstrating that the original injury became aggravated by some routine event which triggered its recurrence. Such routine event is ordinarily one where the claimant is doing an activity that would be customary in light of his condition.’
“Wilson v. Workers’ Compensation Comm’r, 174 W.Va. 611, 616, 328 S.E.2d 485, 490 (1984); see also Lou Grubb Chevrolet, Inc. v. Industrial Cornm’n, 174 Ariz. 23, 26, 846 P.2d 836, 839 (Ariz.App.1992) (‘[An] employee’s reasonable conduct in causing a later nonindustrial injury does not relieve the employer of liability if the later injury is the “direct and natural result” of the compensable work injury.’). Thus, ‘a subsequent injury, whether an aggravation of an original injury or a new and distinct injury, is compensable if it is the direct and natural result of a compensable primary injury.’ 1 Larson, supra, § 13.11.”
In its judgment in this case, the trial court determined that nonoccupational factors resulted in McRae’s August 28, 2010, injury and that the subsequent injury bore no causal relation to the original injury. Specifically, the trial court referred to Dr. Miller’s medical records of February 2010 and May 2010, which state that both the left-leg fracture and the wound were healed, and concluded that “[t]he medical evidence presented at trial indicates a clear distinction between [McRae’s] two injuries.” Under the successive-compensable-injury test, “ ‘it is not the situs of the second injury (ie., either the place where the accident occurred or the physical location of the injury) that is controlling, but rather whether the subsequent injury was a natural consequence of a prior compensable injury.’ ” Sistrunk v. Sikorsky Support Servs., Inc., 961 So.2d 166, 170 (Ala.Civ.App.2007) (quoting Erwin v. Harris, 474 So.2d 1125, 1128 (Ala.Civ.App.1985)). The applicable standard is not whether the subsequent injury was caused by nonoccupational factors, nor is the applicable test whether there is a causal connection between the two injuries. See Ex parte Dunlop Tire Corp., 772 So.2d 1167, 1171 (Ala.2000). Rather, the applicable standard is whether McRae’s second injury, i.e., the “busting open” of the scar, is “ ‘the direct and natural result’ ” of his April 2009 injury, “regardless of whether it was incurred at work or elsewhere.” Sistrunk, 961 So.2d at 170 (citing Landstar Ranger v. Kent, 828 So.2d 322 (Ala.Civ. App.2002), and Erwin, 474 So.2d at 1128). The trial court’s judgment does not specify how the subsequent injury was the result of an independent intervening cause attributable to McRae’s own intentional conduct, nor does the trial court provide any indication that stepping in a hole would be considered an independent intervening cause *178 not attributable to McRae’s customary activity in light of his condition. Therefore, we reverse the trial court’s judgment on this matter, and we remand the cause to the trial court for further proceedings concerning the application of the successive-compensable-injury test. See Pike County Comm’n, supra (injured employee’s herniated disk caused while picking up his 12-pound baby at his home was compensable under suecessive-compensable-injury test as a natural consequence of the primary injury); see also Wal-Mart Stores, Inc. v. Orr, 29 So.3d 210 (Ala.Civ.App.2009)(finding that there was not substantial evidence to conclude that injured employee’s left-hip injury, which was based on avascular necrosis, was a natural consequence of the compensable left-knee injury); Sistrunk, supra (holding that the trial court misapplied the applicable standard in determining compensability for a subsequent injury caused by overcompensation); Landstar Ranger, supra (concluding that, under the successive-compensable-injury test, the injured employee injured his left shoulder as a result of overcompensating for a previously injured right shoulder and holding that the employee was performing activity that would be customary in light of his position); and Labinal, Inc./Globe Motors v. Alphord, 820 So.2d 104, 112 (Ala.Civ.App.2001) (Crawley, J., concurring in the result)(“The successive-compensable-injury test ... applies to injuries that are not directly related to work activities.... ”). As to McRae’s complaints of leg pain and back pain, which are not specifically addressed in the trial court’s judgment, we instruct the trial court to determine on remand whether McRae is entitled to compensation for those complaints under the successive-compensable-injury test, and, if so, to amend its judgment accordingly.
We pretermit discussion on the trial court’s judgment concerning the date McRae reached MMI. If, on remand, the trial court determines that the successive injuries are compensable under the legal standard discussed, supra, the trial court should also reevaluate whether the date of MMI should remain at May 24, 2010, or whether it should be modified in light of the compensability of the successive injuries.
Similarly, we pretermit discussion on the issue of McRae’s alleged unreasonable refusal of an offer of suitable employment under § 25-5-57(a)(3)e. However, we note, for the trial court’s consideration in amending its judgment on remand, that in cases in which § 25-5-57(a)(3)e is applicable, the statute does not bar recovery of permanent-partial-disability compensation for scheduled injuries. See Agricola Furnace Co. v. Smith, 239 Ala. 488, 492, 195 So. 743, 746 (1940)(finding that “Section 7551, Code (General Acts 1936 [Extra Session], page 12, § 2),” the precursor statute to § 25-5-57(a)(3)e, “is inapplicable to cases involving permanent partial disability enumerated in the schedule”); see also 1 Moore, Alabama Workers’ Compensation § 16:52 at 753(“A refusal of suitable work does not affect the payment of schedule permanent partial disability benefits.”). Thus, the penalty in § 25-5-57(a)(3)e cannot bar McRae from receiving permanent partial-disability benefits for his leg pursuant § 25-5-57(a)(3)a(16). Additionally, we note that § 25-5-57(a)(3)e cannot bar McRae from receiving medical benefits under § 25-5-77, Ala.Code 1975, because the penalty statute, if applicable, only prohibits an injured employee from receiving “compensation.” “[M]edical and surgical treatment and attention, medicine, medical and surgical supplies, and crutches and apparatus furnished an employee on account of an injury” are specifically excluded from the definition of compensation in § 25-5-1(1), Ala.Code 1975. The penalty statute, however, may serve to bar an in *179 jured employee from receiving compensation for injuries not on the schedule and temporary-total-disability benefits.

Conclusion

For the foregoing reasons, we affirm the judgment on the issue of the burden of proof; we reverse the judgment and remand with instructions on the issue concerning successive injuries; and we preter-mit discussion as to the issues relating to the date of MMI and McRae’s alleged unreasonable refusal to return to work.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
PITTMAN, THOMAS, and MOORE, JJ., concur.
THOMPSON, P.J., concurs in the result, without writing.